FILED

2012 MAR 30  PM 4: 16

PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

| | |
|---|---|
| HIDDEN VILLAGE, LLC, | ) |
| . | ) |
| Plaintiff, | ) CASE NO. 1:10CV0887 |
| | ) |
| v. | ) JUDGE BENITA Y. PEARSON |
| | ) |
| CITY OF LAKEWOOD, OHIO, *et al.*, | ) |
| | ) |
| Defendants. | ) **MEMORANDUM OF OPINION &** |
| | **ORDER** [Resolving ECF No. 49] |

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A. Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1. Plaintiff and its Tenant–Youth Re-Entry Program . . . . . . . . . . . . . . . . . . . . . . . 3
        2. Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    B. Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    C. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III. DISCUSSION OF AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    A. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    B. Fair Housing Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        1. Whether §§ 3604 and 3617 of the FHA Require a Showing that
                                    Defendants' Conduct Made Housing Unavailable or
            Resulted in the Denial
                                    of Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            a. § 3604
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            b. § 3617 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        2. Whether Hidden Village has presented sufficient evidence to
        sustain/establish a  § 3617 claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
            a. Factors One and Two of the § 3617 Test  . . . . . . . . . . . . . . . . 30
            b. Factor Three of the § 3617 Test: *McDonnell Douglas* Analysis  . . . . 31
                i. *Prima Facie* Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(1:10 cv 0887)

a. Racial Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
b. Sequence of Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
c. Administrative History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

d. Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
ii. Legitimate Non-Discriminatory Reason & Pretext . . . . . . . . . 45
c. Factor Four of the § 3617 Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
C. 42 U.S.C. §§ 1981 and 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
1. Whether Hidden Village has Standing to Sustain §§ 1981 and 1982 claims
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
2. Whether Hidden Village has Established §§ 1981
and 1982 *Prima Facie* Case . . . . . . . . . . . . . . . . . . . . 59
D. 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
1. Fourth Amendment Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
a. Whether Hidden Village has Standing to Sustain a Fourth
Amendment § 1983 Claim . . . . . . . . . . . . . . . . . . 61
2. Fourteenth Amendment Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
a. Whether Hidden Village has Failed to Plead a Fourteenth
Amendment § 1983 claim . . . . . . . . . 64
b. Whether Hidden Village has Standing to Assert a Fourteenth
Amendment § 1983 claim . . . . . . . . 65
c. Whether Hidden Village has Failed to Establish a Fourteenth
Amendment §1983 *Prima Facie* Case

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
d. Whether Hidden Village's § 1983 Monell Claim Fails
as a Matter of Law . . . . . . . . . . . . . . . 67
E. Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
F. Trespass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
G. State Law Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
1. Lakewood and Individual Defendants Named in their Official Capacities . . 76
2. Defendants Named in their Individual Capacity . . . . . . . . . . . . . . . . . . . . . 77

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

2

(1:10 cv 0887)

## I. INTRODUCTION

Before the Court is the Motion for Summary Judgment of Defendants City of Lakewood ("Lakewood"), Thomas J. George ("George"), Charles E. Barrett ("Barrett), and Edward Fitzgerald ("Fitzgerald") (collectively "Defendants").  ECF No. 49.  Plaintiff Hidden Village, LLC ("Hidden Village") has responded to the instant motion (ECF No. 52); Defendants have replied (ECF No. 59).  Oral argument was heard April 4, 2011.  For the reasons articulated below, Defendants' Motion is denied.

## II. BACKGROUND

### A. Parties

#### 1. Plaintiff and its Tenant–Youth Re-Entry Program

Plaintiff Hidden Village, LLC ("Hidden Village") is the owner and manager of Hidden Village Apartments, located on the Eastern border of Lakewood, Ohio.  ECF No. 1 at 4, 7.  The company's current members, Gary Lieberman and Michael Priore, own several apartment complexes within Lakewood, and acquired the property of Hidden Village Apartments in 2001. ECF No. 52-1 at 2, 4, 17.

The Hidden Village Apartment complex consists of ninety-seven apartment units in four separate apartment buildings, designated as A, B, C and D.  ECF Nos. 1 at 7 and 52-1 at 6. Beginning in April of 2006, the apartments within Buildings C and D were occupied by the Lutheran Metropolitan Ministries' Youth Re-Entry Program, which is not a party to this lawsuit. ECF Nos. 52 at 12.

3

(1:10 cv 0887)

The Youth Re-Entry Program ("YRP") is an independent living program for at-risk youth, operated by the Lutheran Metropolitan Ministries ("LMM"), a religious based non-profit organization in northeast Ohio.  ECF No. 52-3 at 2-3.  By providing supervised and cluster-site living as well as instruction on topics such as anger management, banking, and apartment rentals, the Program seeks to prepare young adults for independent living.  ECF No. 52-4 at 2 and 5.  At all relevant times, the youth served by YRP ranged in age from 16-21 years old, and were referred to the Program as they were released from the custody of either the foster care system, operated by the Department of Child and Family Services, or the juvenile corrections system of the Ohio Department of Youth Services.  ECF No. 52-4 at 2-3.  On average, 80% of the YRP clientele was African American.  ECF No. 52-4 at 4.

### 2.  Defendants

Lakewood is a municipal corporation organized under the laws of the State of Ohio and, at all relevant times, was the employer of the individually named Defendants.  ECF No. 1 at 4. George is the former Mayor and Chief Executive Officer of Lakewood.  ECF No. 1 at 4. Fitzgerald was the former Administrator for Lakewood's Division of  Housing and Building Department.  ECF No. 49-4 at 2.  He was responsible for budgeting and all of the administrative paperwork for the Department.  ECF No. 49-4 at 2.  Additionally, Hidden Village indicates that Fitzgerald is also the Supervisor for Charles Barrett, the former Lakewood Building Commissioner.  ECF No. 52 at 11.

As Building Commissioner, Barrett was responsible for enforcing and interpreting the meaning and application of the zoning code.  He was also required to provide notifications,

4

(1:10 cv 0887)

revocation notices, stop orders, or citations when a violation of the zoning code occurred.  ECF No. 49 at 10.

### B.  Facts

The circumstances giving rise to this instant lawsuit began in 2006, when YRP sought to relocate from a drug-infested community in Cleveland to a more desirable location.  ECF No. 52-3 at 4. After a case manager noticed an advertisement for Hidden Village in the newspaper (ECF No. 52-4 at 6), Kandi Withers, the Director of YRP, and Mark Brauer, the Director of Youth Services for LMM, met with representatives from Hidden Village to discuss becoming tenants of the apartment complex, and, soon thereafter, YRP signed a lease to rent YRP Buildings C and D in the complex.  ECF No. 52 at 10, 7.

Prior to YRP's move-in date, Brauer contacted an acquaintance in Lakewood's Health and Family Services Department to schedule a meeting with various city officials for the purpose of developing a good working relationship with Lakewood.  Specifically, Brauer wanted to establish a positive relationship with Lakewood's Police Department.  ECF No. 52-3 at 13-14. His request was submitted to Lakewood's Health and Family Services Director, Dottie Buckon, who requested information about the YRP.  Brauer provided the requested information, and Buckon arranged the meeting.  ECF Nos. 52 at 11 and 52-3 at 7-8.

On February 14, 2006, the meeting was held at Lakewood City Hall.  ECF No. 49-15 at 7-8.  In attendance were YRP officials, Priore of Hidden Village, Defendant Barrett and other government officials—including individuals from Lakewood's Law, Building, and Police Departments, and the County's Department of Children and Family Services.  ECF No. 49-15 at

5

(1:10 cv 0887)

7-8.

In the meeting, Brauer provided the attendees with an overview of the YRP and identified

the reasons that the City of Lakewood was chosen as the Program's new home.  ECF No. 52-3 at

10.  Immediately following Brauer's presentation, however, Barrett indicated that the tenancy of

YRP was incompatible to Lakewood's zoning ordinance.  Barrett read the applicable permitted

use for the Hidden Village apartment complex from the Lakewood Zoning Code, (ECF No. 52-3

at 10) which states:

> In the M.H. District no building or premises shall be used or established which is
> designed, arranged, or intended for other than a medium density multiple-family
> residential building, a low density multiple family residential building, a single, or
> two-family dwelling, adult family home, adult group home, or cluster house
> development.

ECF No. 52-13.

Based upon his interpretation of the foregoing zoning code, Barrett opined that YRP's

tenancy constituted an institutional use—prohibited by the code—rather than a residential

use–expressly authorized under the code.  Other government officials contributed to the

discussion by suggesting alternative locations to which Hidden Village could relocate.  ECF Nos.

52-3 at 11 and 52-6 at 10.  Although the parties maintained a civil demeanor, Brauer testified that

the overall tone expressed by the City representatives was that YRP should not move to

Lakewood.  ECF No. 52-3 at 12.

Nevertheless, after the meeting, Brauer told Mary Louise Madigan, a member of

Lakewood's City Council, that YRP's relocation plans had not wavered and that legal counsel for

YRP found Barrett's position "untenable."  ECF No. 52-10.  Accordingly, in April of 2006, YRP

6

(1:10 cv 0887)

moved into Hidden Village Apartments.  ECF No. 52-3 at 15.

On April 18, 2006, Defendants Barrett, Fitzgerald, and Sergeant Edward Favre of the Lakewood Police Department, went to Hidden Village Apartments, after having been informed of YRP's relocation.  ECF No. 52-12.  The City officials spoke to Wanda Jacobs, the office manager for YRP.  Through that visit, the City officials identified the specific buildings occupied by YRP and the manner in which the units were utilized.  Jacobs asked the officials if they had a search warrant and, when they answered negatively, she refused to further respond to their questions.  Jacobs also explained that she believed the attorneys for the City and the YRP had resolved the zoning issues.  ECF No. 52-12.

*Barrett's Zoning Determination*:  On May 18, 2006, Barrett issued a letter to Prior of Hidden Village.  The document noted Barrett's disappointment with YRP's occupancy of Hidden Village Apartments and indicated that Priore had until June 17, 2006 to remove the "unpermitted use."  ECF No. 52-13.

Hidden Village, however, appealed Barrett's zoning determination to the Lakewood Planning Commission.  ECF No. 1 at 12.  After a hearing was held, the Lakewood Planning Commission unanimously overruled Barrett's zoning determination.  The Commission found YRP's occupancy to be a residential use of Hidden Village Apartments, and thus permissible under the zoning code.  ECF Nos. 1 at 13; 52-14 at 1; 49 at 13.

*Lakewood Police Department Correspondence*:  On October 11, 2006, Lieutenant Ciresi of the Lakewood Police Department issued the following departmental correspondence:

7

(1:10 cv 0887)

> Attached is a phone contact list for the Youth Re-entry program (YRE) located at 11849 Clifton.  There are 27 clients in the program that reside in buildings C and D…If you have someone who lives in C or D, they are YRE clients as they have 100% occupancy of those buildings.  Any contacts with YRE clients need to be documented.  At minimum, have their names entered in into the CAD person file.  The only way we can document that we are having problems with YRE residents is to record their information.  FI's, citations, MIN, person file – all of these can be useful for documentation. Citations and arrests are the preferred course of action for any violations encountered on or off site, in the vicinity of 11849 Clifton…
>
> DISPATCH: ON ANY DETAILS INVOLVING 11849 CLIFTON PLEASE ATTEMPT TO DETERMINE THE APT. BUILDING (A, B, C, D) AND APT. NUMBER AND PUT THIS INTO THE CAD ENTRY.

ECF No. 52-17.

One day later, Captain Hassing of Lakewood Police Department issued a similar correspondence to the Shift Commanders within the Department instructing them to complete a report for those criminal acts or disturbances occurring at Hidden Village and those occurring off-site when the acts involved YRP participants.  He further stated that " [i]f there are any witnessed violations citation are to be issued o[r] arrests made if appropriate."  ECF Nos. 52-16 and 52-3 at 17.

Hidden Village states that YRP staff began to receive complaints concerning police harassment of its participants.  ECF No. 52-7 at 23.  Withers and Jacobs testified that only the African American clients reported these problems.  ECF Nos. 52-4 at 22 and 52-3 at 17. Additionally, a memorandum signed by Withers delivered the following message to the Program's participants:

8

(1:10 cv 0887)

WARNING YRP RESIDENTS!!!!!
LAKEWOOD POLICE WILL BE ARRESTING ANYONE
WALKING ON ANY RAILROAD TRACK IN THE CITY OF
LAKEWOOD.

IF YOU USUALLY USE THE TRACKS TO GET TO YOUR
DESTINATION, YOU MUST USE A SAFER, ALTERNATIVE
ROUTE.

LAKEWOOD POLICE HAVE ALSO MADE IT VERY
CLEAR THAT THEY ARE GOING TO BE WATCHING
OUR PROGRAM AT ANY TIME.  PLEASE MAKE
SURE THAT YOU ALWAYS PRESENT YOURSELF IN AN
APPROPRIATE MANNER TO AVOID ANY UNECESSARY (sic)
HARASSMENT!!!

ALSO, IF YOU ARE APPROACHED BY POLICE, BE
BE (sic) COOPERATIVE.

IF YOU HAVE ANY QUESTIONS, PLEASE SEE YOUR
CASE MANAGER

THANK YOU FOR YOUR COOPERATION.

MRS. WITHERS

ECF No. 52-17.

In the beginning of October 2006, Councilperson Madigan requested a meeting to discuss

Hidden Village and the YRP.  ECF No. 52-19.  According to Withers' notes, Brauer, Madigan,

Sergeant Favre, Lakewood police, and two neighborhood citizens all attended the meeting,

wherein one of the neighbors indicated that he "thought he had seen a YRP teen making a drug

deal" and the police "said that YRP was responsible for a crime wave."  ECF No. 52-20 at 5.

*Mayor George's Removal Letter*:  On February 28, 2007, then Mayor George sent a letter

to the President of LMM, wherein the Mayor expressed concern that YRP moved into Hidden

9

(1:10 cv 0887)

Village, despite Barrett's initial determination that YRP occupancy did not conform to the permitted use.  And after indicating that police intervention had more than doubled within the vicinity of Hidden Village since YRP's relocation to the area, then Mayor George issued a "FAIR WARNING":  he would personally seek to have the Program removed from Lakewood at the earliest possible time.  ECF No. 52-24.

On May 16, 2007, City officials and YRP representatives met to discuss the relationship between the police and the YRP.  In his former capacity, George testified that the meeting involved "a general discussion about the situation and some venting" (ECF No. 49-17 at 4), as YRP representatives provided clarification that most of the criminal activity came from persons outside of the Program and the city officials expressed their concern that the surrounding area "was [an] unsafe neighborhood anyway for a program."  ECF No. 49-17 at 5.  However, Withers testified to the accuracy of her notes/log entry chronicling the meeting which not only describe the meeting as heated, but also indicate that there was clear opposition to YRP from representatives of the Lakewood Police Department who, during the meeting, asked if YRP would vacate from Hidden Village Apartments.  ECF Nos. 52-4 at 25-27 and 52-20 at 6.

*Lakewood Inspections*:  On May 22, 2007, six days after the aforementioned meeting, various "Lakewood officials," including Sergeant Edward Favre, and Gilman Scott, Lakewood Fire Inspector, descended upon Hidden Village unannounced.  ECF Nos. 52 at 10; 52-5 at 4-5; and 52-9 at 5-6.  Plaintiff's version and Defendants' version of the facts concerning this event differ significantly.

10

(1:10 cv 0887)

Defendants have characterized the event as a joint inspection—a collaborative effort on behalf of Lakewood's fire, police, and health departments—to inspect Hidden Village Apartments for the dual purpose of (1) verifying that all heath and safety issues were properly addressed, and (2) determining the complex's appropriate fire code classification.  ECF Nos. 59 at 9; 59-5 at 2-4; 59-6 at 2-4.

According to Sergeant Favre, the inspection of Hidden Village was the result of an impromptu decision.  He testified that the team of city officials had already been assembled to conduct a joint inspection of a neighboring property in Lakewood, [that was] suspected of drug and criminal activity.  He stated that upon the conclusion of that inspection, the group had an on-the-spot discussion concerning Hidden Village and collectively decided to redirect their efforts to conducting an inspection of the compound.  ECF No. 52-5 at 4-5.  During his deposition, he could not clearly recall if inspecting Hidden Village had been his idea.[1]

---

[1] Q    (Plaintiff's counsel): Isn't it actually true that what happened on May 22nd, 2007, was that you had already organized the inspection of the North and South lane properties as a result of criminal activity and resident complaints, and that while you were at that inspection, you decided to take that group of people over to Hidden Village without prior notice?

A    (Favre): We were at North and South to answer complaints, yes.  And when we completed there, we had everybody together, and so –

Q:    So if I'm understanding and Mr. Gilman testified this morning before you.  He indicated that he had no knowledge that you were going to go over to Hidden Village until after you had completed the North and South Lane inspections.  Was that just, basically, a decision that you made once you had everybody gathered and you completed the inspections at North and South Lane?

A:    It was pretty much an on-the-spot discussion.

...

A:    What I'll say is we had completed what we were doing, a group of us were standing there and the discussion was, whoever brought it up; it may have been me, it may have been

11

(1:10 cv 0887)

Relying upon Withers' testimony concerning the event, Defendants contend that once they entered into the complex, none of the YRP enrollees objected to the inspection of the apartments. ECF Nos. 59 at 24; 49 at 15;and 52-4 at 17.

Needless to say, Hidden Village paints a remarkably different picture of what occurred on May 22, 2007. Hidden Village states that the encounter with City officials on that date amounted to a raid. ECF No. 52 at 17-18. In support of this contention, Plaintiff highlights Withers' testimony, wherein she noted that amongst the city officials, there was at least one police officer clothed in SWAT attire, and also a police canine unit.[2] ECF No. 52-4 at 62-63. And, although she could not recall whether the residents objected to the officials entering their units (ECF No. 52-4 at 17), she testified that she remembered the residents being very intimidated and very afraid. ECF No. 52-4 at 16, 20.

As to whether management objected to the inspections, Hidden Village highlights that Withers objected to the "raid[.]" ECF Nos. 52-4 at 17-18. The Complaint further states that "upon learning of the raid in progress, counsel for [Hidden Village] demanded that all City

---

someone else: "Do you want to go over and we'll check Hidden Village while we're altogether?" and everybody basically said, "Sure."

Q:   You said it may have been you. Mr. Gilman said it was not him. Mr. Fitzgerald said it was not him. Do you know who else may have said, "Hey, while we're here, let's go do Hidden Village?"

A:   Well, we had -- I'm not going to look to blame whose idea it was. I've already said it may have been mine. If I knew for sure that it was my idea, I would tell you that.

Q:   Okay. ECF No. 52-5 at 4-5.

[2] Withers testified that the dogs were located in a vehicle in Hidden Village Apartment's parking lot. ECF No. 52-4 at 63.

(1:10 cv 0887)

officials leave and obtain a search warrant." ECF No. 1 at 18. Withers also noted that within

Hidden Village Apartments, she believed that the team only inspected Buildings C and

D–Buildings occupied exclusively by YRP residents.[3] ECF No. 52-4 at 21.

The Complaint states that as a consequence of the raid, on May 23, 2007, the City of

Lakewood was put on formal notice that future warrantless searches and other intimidating

behavior would not be tolerated. ECF No. 1 at 18.

On May 29, 2007, Scott Gilman, Fire Inspector of Lakewood, returned to Hidden Village

Apartments to conduct a subsequent inspection. ECF No. 52-9 at 10. He testified that he did so

because he needed to seek clarification of the building's use classification. ECF No. 52-9 at 12-

13. After contacting a Fire Marshal from the State for assistance, Gilman and the State Fire

Marshal entered onto Hidden Village's property, a short time later. ECF No. 52-9 at 12-13; ECF

No. 59 at Fn. 4. According to Marilyn Watts, manager of Hidden Village Apartments, she

repeatedly asked the officials to leave, but they refused. ECF No. 49-18 at 4-6. Lieberman

testified that he told Watts "to tell them that they are not allowed [onto Hidden Village] without a

warrant." ECF No. 52-1 at 13. Watts indicated that the fire officials eventually left the property,

after Gilman told her that he would return once he acquired a warrant. ECF No. 49-18 at 6.

Hidden Village states that on June 1, 2007, it wrote to Defendants concerning the pattern

and practice of coercion and intimidation based on racial discrimination. ECF No. 1 at 19.

---

[3] Defendants claim to have also searched Building B, but not in its entirety. ECF No. 59 at 9; ECF No. 52-9 at 7. They claim that Building A was not inspected because it had a different residential use than the other buildings. *Id.*

13

(1:10 cv 0887)

In July of 2007, owners of Hidden Village were allegedly cited for failing to maintain a hedge at a three foot height, even though, according to Plaintiff, the hedge had been maintained at a four foot height for over a decade.  ECF No. 1 at 20.

### C.  Procedural History

On April 23, 2010, Hidden Village filed a complaint against the Defendants seeking monetary relief as well as declaratory, injunctive, and other equitable relief.[4]  ECF No. 1.  The Complaint contains the following federal and state claims against each Defendant:

> • Fair Housing Act, 42 U.S.C. § 3601, *et seq.*;
>
> • Civil Rights Act of 1866, 42 U.S.C. § 1982;
>
> • Civil Rights Act of 1870, 42 U.S.C .§ 1981;
>
> • Civil Rights Act of 1871, 42 U.S.C. § 1983;
>
> • State law claim of trespass.

ECF No. 1.

In response to the instant lawsuit, on December 10, 2010, Defendants moved for summary judgment on all claims.  ECF No. 49.  Their arguments for dismissal are discussed in detail below.

### III.  DISCUSSION OF AUTHORITY

### A.  Summary Judgment Standard

Summary judgment is proper if "there is no genuine issue as to any material fact [and] the

---

[4] Pursuant to Stipulation, the parties agreed to dismiss, with prejudice, Count III pertaining to tortious interference with contractual relations, ECF No. 57, and Defendants Police Chief Timothy Malley and Fire Chief Lawrence Mroz, ECF No. 56.

14

(1:10 cv 0887)

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling* Co., 12 F.3d 1382, 1388-89 (6th Cir. 1993).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### B.  Fair Housing Act

The Fair Housing Act (FHA) was established by Congress to insure that people who have historically suffered from discrimination in the housing markets would have an equal opportunity to housing.  *See People Helpers Found. v. Richmond*, 789 F. Supp. 725, 731 (E.D. Va. 1992).

In the Complaint, Hidden Village generally alleges that Defendants' actions constitute violations of the FHA, 42 U.S.C. §§ 3601, *et seq*., and § 3617 in particular, which provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section[s] [3603, 3604, 3605 or 3606].

42 U.S.C. § 3617.

(1:10 cv 0887)

The other provisions of the FHA relevant to Hidden Village claims are §§ 3604(a) and (b) which makes it unlawful:

> (a)    To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin;

> (b)    To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. §§ 3604(a) and (b).

### 1.    Whether §§ 3604 and 3617 of the FHA Require a Showing that Defendants' Conduct Made Housing Unavailable or Resulted in the Denial of Housing.

Defendants first contend that they are entitled to summary judgment as to all of the FHA claims because Hidden Village has failed to present claims that are covered under the Act.  They contend that the scope of the FHA with respect to §§ 3604 and 3617 only provide legal protection against acts that have made housing unavailable or resulted in the denial of housing to a protected class member.  ECF Nos. 49 at 18-21 and 59 at 16-21.  Given that the record reflects that Hidden Village has neither alleged nor produced evidence that Defendants' actions made housing unavailable or resulted in the exclusion of housing for a YRP participant or any other protected class member, Defendants aver that Plaintiff's FHA claims are unsustainable.  ECF Nos. 49 at 18-21 and 59 at 16-21.

In support of Defendants' position that the instant allegations are not actionable under the Act, Defendants rely principally upon the holding and analysis of *AHF Cmty. Dev., LLC v. City of*

16

(1:10 cv 0887)

*Dallas*, 633 F. Supp. 2d 287 (N.D. Tex. 2009)—a non-binding case with an analogous fact

pattern.

In *AHF*, the property owner of a large apartment complex filed a complaint against the

municipality based upon its allegation that the City had harassed and intimidated its

predominantly African American and Hispanic tenants. *Id*. at 289-91. The owner averred that as

a means to expel the minority residents from the community, the City conducted a "raid"—a

series of property inspections—upon its complex, cited the owner for code violations, and

threatened to file a nuisance abatement lawsuit. *Id*. at 291-92. Believing the City's actions to be

motivated by discriminatory animus, the owner argued that the City's conduct violated

§§ 3604(a), 3604(b) and 3617 of the FHA. *Id*. at 289, 292.

The Court, however, disagreed and ruled that the City was entitled to summary judgment

on all of the FHA claims. *Id*. at 297. Relying upon decisions from the Fifth and Seventh Circuit

Courts of Appeal, the Court concluded that the objective of the FHA was to prohibit

discriminatory conduct that directly implicated the availability or acquisition of housing, rather

than its habitability or the enjoyment gained therefrom. *Id*. at 298-99, 302 (citing to *Halprin v.*

*Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 329-30 (7th Cir. 2004) and

*Cox v. City of Dallas*, 430 F.3d 734, 740-41 (5th Cir. 2005)). Accordingly, in the absence of

evidence indicating that the City's actions resulted in the denial of housing or otherwise made

housing unavailable to the owner's tenants, the Court held that the owner's claims of harassment

and intimidation were insufficient to sustain a viable FHA claim. *Id*. at 299-305.

17

(1:10 cv 0887)

Specifically, the § 3604(a) claim was rejected by the *AHF* Court because it did not implicate availability as the record did not reflect that the tenants were constructively evicted. *Id. at 300-01*.  The § 3604(b) claim was also dismissed on similar grounds, in spite of the Court's determination that its scope was different from § 3604(a)'s.  Although the Court held that § 3604(b) only pertained to conduct connected to the sale or rental of housing, the Court indicated that this statutory provision, nevertheless, shared a similar focus with § 3604(a).  *Id. at 301-02*.  Accordingly, the Court found this provision to be inapplicable–noting that the alleged discriminatory conduct failed to implicate availability concerns as under the previous subsection. *Id.*  The Court stated, "in order for [plaintiff to have a viable claim], the reach of § 3604(b) would have to be enlarged to cover conduct that makes a rented dwelling less habitable and enjoyable, even if not unavailable." *Id. at 302*.

As for the § 3617 claim, the *AHF* Court summarily dismissed this allegation as well. After concluding that in *Cox v. City of Dallas*, 430 F. 3d 734, the Fifth Circuit determined that the FHA is only concerned with discrimination in the acquisition of housing, the *AHF* Court examined the statutory text of § 3617 and indicated that it, too, supported this restrictive interpretation.  *See AHF*, 633 F.Supp.2d at 302.  The Court suggested that because the statutory language of § 3617 refers to the rights "granted or protected" by § 3604 or one of the other enumerated sections, § 3617 could not provide a stand-alone basis for liability; which thereby implied that a viable claim under § 3617 necessitated a violation under one of the referenced provisions.  *Id.* (citing to *Halprin* 388 F.3d 327 at 330).  Thus, in light of the Court's determination that §§ 3604(a) and (b) were limited to acts implicating availability and were,

18

(1:10 cv 0887)

therefore, not applicable—the Court held that § 3617 also contained this restriction, and ruled that this claim must also fail.  *Id.* at 303 (citing to two unpublished Fifth Circuit cases, including *Reule v. Sherwood Valley I Council of Co-Owners Inc.*, 235 Fed. Appx. 227 (5th Cir. 2007)).

Although the *AHF* court framed its discussion concerning the viability of the owner's FHA claims in terms of whether the claims "implicat[ed] availability or acquisition," a review of the case law relied upon by the *AHF* Court reveals that the Court's inquiry was simply a rendition of a highly contested method for assessing the viability of FHA claims—determining FHA coverage based upon whether the alleged discrimination occurred at the time of or after the acquisition of housing.

This method was largely influenced by the Seventh Circuit Court of Appeals decision in *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327 (7th Cir. 2004),[5] —a case that is not only cited by the *AHF* Court[6], but is also repeatedly used by Defendants to bolster their position.[7]

In *Halprin*, a Jewish plaintiff and his spouse alleged that their homeowner's association and several of its members violated §§ 3604 and 3617 of the FHA by engaging in a campaign of religious harassment against them.  *See Halprin*, 388 F.3d at 329.  After indicating that the FHA contains no hint of a concern with any issue but access to housing, the Seventh Circuit held that

---

[5] *See Rigel Oliveri, Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C.L. L. Rev. 1, 1-2 (2008).

[6]  *See AHF*, 633 F.Supp.2d at 298-99, 302-03.

[7] ECF Nos. 49 at 18-19 and 59 at 18-19.

(1:10 cv 0887)

the current homeowners' allegations were not actionable under §§ 3604(a) and (b) because the plaintiffs were not complaining about being prevented from acquiring property.  *Id*. at 328-30. The Court noted, however, that as "a purely semantic matter the statutory language might be stretched far enough to reach a case of 'constructive eviction.'"  *Id*. at 329.

With respect to § 3617, the *Halprin* Court strongly suggested that absent an underlying violation of § 3604, the homeowners' § 3617 claim must also fail.  *Id*. at 330.  But, the Court begrudgingly allowed this claim to proceed due to the existence of a U.S. Department of Housing and Urban Development (HUD) regulation permitting post-acquisition harassment claims, and because the defendants' failed to challenge the regulation, in light of the Court's inference that said regulation was invalid.  *See Halprin*, 388 F.3d at 330.

Soon after *Halprin* was decided, the Fifth Circuit issued *Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005)—which similarly restricted the scope of the FHA concerning post-acquisition claims.  In *Cox*, homeowners in a predominately black neighborhood alleged that the City's failure to prevent illegal dumping near the residents' homes violated §§ 3604(a) and (b) of the FHA.  *Id*. at 736, 740-745.

Although the Fifth Circuit acknowledged that the City's misconduct may have diminished the habitability of the plaintiffs' homes, the Court found such allegations insufficient to support a claim under either statutory provision and therefore affirmed the district court's dismissal of the FHA claims.  *Id*. at 740-47.

(1:10 cv 0887)

As in *AHF*, the *Cox* court concluded that plaintiffs failed to state a claim under § 3604(a) because the city's conduct did "not make dwellings 'unavailable' within the meaning of the act." *Id.* at 740.  And § 3604(b) was likewise inapplicable because the complained of conduct "was not 'connected' to the sale or rental of the dwelling."  *Id.* at 745.

Moreover, the Court's conclusion that § 3604 could  "encompass the claim of a current owner or renter for attempted and unsuccessful discrimination relating to the initial sale or rental or for actual or constructive eviction" insinuated that while § 3604 covered a wide range of pre-acquisition conduct, the protection afforded to post-acquisition claims was limited.  *See Id.* at 746.  Such claims are not cognizable unless the discrimination becomes so egregious that it amounts to actual or constructive eviction–*i.e.*, has the effect of making housing unavailable or has resulted in the denial of housing.[8]

While, in *Cox*, the Fifth Circuit did not address the applicability of § 3617 to post-acquisition claims, the Court subsequently expressed its opinion on the matter in an unpublished *decision—Reule v. Sherwood Valley I Council of Co-Owners Inc.*, 235 Fed. Appx. 227.  Citing to both *Halprin* and *Cox*, the Court held that the plaintiff's "claims under §§ 3604 and 3617 of the FHA [must] fail because they go to the habitability of her condominium and not the availability of housing."  *Id.* at 227-28.

---

[8] *See Cox*, 430 F.3d at 746 n.37 (stating that the discriminatory conduct of "failing or delaying maintenance or repairs" appears not to be connected to the sale or rental of dwelling, and therefore not actionable under § 3604(b) . . . unless "such actions are aimed at evicting or constructively evicting a tenant").

(1:10 cv 0887)

Although other Circuits have weighed in on the post versus pre–acquisition debate by providing opinions as to whether the FHA reaches post-acquisition claims[9] and whether a viable § 3617 depends on the validity of one of the other enumerated provisions,[10] the Sixth Circuit has been largely silent in this discussion.  ECF Nos. 33 at 22-23 and 59 at 20-21.  Nevertheless, Defendants cite to the Sixth Circuit's decision in *Maki v. Laakko*, 88 F.3d 361 (6th Cir. 1996), in support of the proposition that this Circuit has at least implicitly endorsed the conclusion of *AHF*—that a post-acquisition claim of harassment is not actionable under the FHA absent actual or constructive eviction.

In *Maki* former Iraqi tenants of a housing property alleged that they were harassed by their former landlords and subsequently evicted.  *Id.* at 362-63.  Alleging ethnic and familial status discrimination, the tenants sought relief under 42 U.S.C. § 3601, *et. seq*.  *See Maki v. Laakko*, 1994 U.S. Dist. Lexis 14097 ( E.D. Mich. 1994).

On appeal, the Sixth Circuit affirmed the lower court's dismissal of the all-inclusive FHA claim.  *Maki*, 88 F.3d at 362, 364.  As a preface to the Court's ruling, the Sixth Circuit analyzed

---

[9]  *See Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713-15 (9th Cir. 2009) (holding that the FHA does apply to post-acquisition discrimination); *Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009) (re-visiting *Halprin* and discussing post-acquisition claims); *Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005).

[10]  *See Bloch*, 587 F.3d 771 (holding that a violation of § 3617 can exist independently); *Frazier v. Rominger*, 27 F.3d 828, 834 (2nd Cir. 1994) (rejecting a § 3617 claim because it was "without a predicate"); *United States v. City of Hayward*, 36 F.3d 832, 836 (9th Cir. 1994) (stating that a violation of "§ 3617 may involve a 'situation where no discriminatory housing practice may have occurred at all . . . because the rights have actually been respected by persons who suffer consequent retaliation.'").

(1:10 cv 0887)

whether the claim was sustainable by employing the foregoing *prima facie* test established in

*Selden Apartments v. United States Dep't of Housing & Urban Dev.*, 785 F.2d 152 (6th Cir. 1986):

> A plaintiff must show the following:
>
> (1)    that plaintiff is a member of a protected class;
> (2)    that plaintiff applied for and was qualified to rent or purchase
>          certain property or housing;
> (3)    that plaintiff was rejected;
> (4)    that the housing or rental property remained available thereafter.

*Maki*, 88 F.3d at 364 (citing *Seldin*, 785 F.2d at 159).  The Court then concluded that "summary judgment was appropriate because the record indicate[d] that the [tenants] were never denied housing that they desired, and thus [could not] meet the second element outlined in *Seldin*."  *Id.*

Defendants concede that *Maki* fails to provide "extensive analysis of the direct relationship between §§3604 and 3617."  ECF No. 59 at 20.  Nevertheless, in light of the fact that the Sixth Circuit "held that all of a plaintiff tenants' fair housing claims fail because plaintiff tenants were not denied housing and housing was not made unavailable," Defendants argue that this Court must make an analogous finding and impose the requirement of proof of actual or constructive eviction to the instant FHA claims.  ECF No. 59 at 20.

*Halprin* and its progeny, no doubt, give some credence to Defendants' general averment that Hidden Village has failed to present a viable FHA claim.  Specifically, these cases support two distinct propositions–to which Defendants aver:  (a)  § 3604  fails to provide relief to Hidden Village because there lacks evidence of an actual or constructive eviction; and, (b) the § 3617 claim likewise fails as its applicability is tied to the viability of the § 3604 claim.

23

(1:10 cv 0887)

Given that the Sixth Circuit has not ruled explicitly, the Court rejects Defendants' aforementioned reasoning and finds Defendant's general averment untenable for the following reasons.

### a.  § 3604

As a preliminary matter, the Court notes that there is a divergence of opinion concerning the scope of § 3604 and whether it provides an avenue of relief for the claims presented in the instant litigation.  Although subsection (a) has been held to only cover conduct that has the effect of making housing unavailable,[11] there is at least some/considerable some case law against taking a similarly restrictive interpretation of the scope of subsection (b).

The cases relied upon by Defendants—*Cox*, *Halprin*, and *AHF*—no doubt support a finding that § 3604(b) is inapplicable given the post-acquisition nature of Hidden Village's allegations and the fact that the alleged discriminatory conduct was not connected to a rental or sale transaction.  But, the reasoning in cases such as *United States v. Koch*, 352 F. Supp. 2d 970 (D. Neb. 2004) and *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009), which the Court finds more persuasive, suggests otherwise.  For instance, both *Koch* and *Modesto* support extending § 3604(b) coverage to post-acquisition harassment claims.  In

---

[11] *See* Rigel C. Oliveri, *Is Acquisition Everything? Protecting The Rights Of Occupants Under The Fair Housing Act*, 43 HARV. C.R.-C.L. L. REV. 1, 4 (2008) ("In addition to situations where discrimination prevents an individual from obtaining housing, § 3604(a) applies where the aggrieved individual already has housing and the discriminatory conduct causes her to lose or abandon that housing."); *see also Clifton Terrace Associates, Ltd. v. United Technologies Corp.*, 929 F.2d 714, 719 (D.C. 1991) ("By [its] plain terms [§ 3604(a)] [] reach[es] discrimination that adversely affects the availability of housing.").

(1:10 cv 0887)

rejecting *Halprin's* pre-acquisition restriction of the scope of § 3604, the *Koch* court stated, "it is difficult to imagine a privilege that flows more naturally from the purchase or rental of a dwelling than the privilege of residing therein; therefore the Fair Housing Act should be (and has been) read to permit the enjoyment of this privilege without discriminatory harassment." 352 F.Supp.2d at 976; *but see Cox*, 430 F.3d at 745 (finding the statutory reading tying "privileges of sale" to include the privileges of continued occupancy and quiet enjoyment unconvincing).

In *Modesto*, the Ninth Circuit, similarly, rejected a narrow interpretation of the FHA, and opined that "limiting the FHA to claims brought at the point of acquisition would limit the [A]ct from reaching a whole host of situations that, while perhaps not amounting to constructive eviction, would constitute discrimination in the enjoyment of residence in a dwelling." 583 F.3d at 714.

Additionally, the *Modesto* Court rejected the argument that "the provision of services or facilities in connection therewith" language of § 3604(b) "refers only to services or facilities provided at the moment of acquisition in connection with the sale or the rental," stating: "this is hardly a necessary reading. There are few 'services or facilities' provided at the moment of sale, but there are many 'services or facilities' provided to the dwelling associated with the occupancy of the dwelling." *Id*. at 713; *but see Cox*, 430 F.3d at 745 (rejecting plaintiffs' § 3604(b) argument that the City discriminated against them in the provision of a service because the service was not connected to the sale or rental of a dwelling and, similarly, rejecting the argument that the privileges clause of subsection (b) provided an avenue of relief because the alleged privileges were not connected to sale or rental of dwelling).

25

(1:10 cv 0887)

The instant Court finds the reading of § 3604 rendered by the Ninth Circuit preferable to the more restrictive reading of the Fifth and Seventh Circuits.  Hidden Village's opposing brief fails, however, to raise these varying interpretations or to even respond to Defendants' general averment regarding the inapplicability of § 3604.  Rather, Hidden Village rests its opposition solely upon the viability of a § 3617 claim under the statute.

As it must, the Court construes Hidden Village's silence as a concession to Defendants' argument, and will, therefore, not decide whether § 3604 fails to provide an avenue of relief.  The approach is reasonable for two reasons:  (1) § 3617 is the only express provision of the FHA that Hidden Village relies upon and (2) as discussed below, the viability of Hidden Village's § 3617 claim does not depend upon the viability of a § 3604 claim.  Thus, an unprovoked detailed examination of the applicability of § 3604 to the instant litigation and whether a cognizable claim requires a showing that housing was made unavailable or denied would be a waste of limited judicial resources.

### b.  § 3617

Having found that Hidden Village has not produced evidence indicating housing was denied or made unavailable to a protected class, it is clear that a § 3604 claim is foreclosed.  The Court is, therefore, left to decide whether Hidden Village's failure to press a § 3604 claim dooms its § 3617 claim.  Defendants argue that it does.  They contend that a § 3617 claim is conditioned upon a violation under § 3604.  ECF No. 59 at 17-20.  The Court disagrees.

First, contrary to Defendants' assertion, there is not a binding Sixth Circuit case regarding this precise issue.  In *Michigan Protection & Advocacy Serv. v. Babin*, 18 F.3d 337, 346 (6th Cir.

26

(1:10 cv 0887)

1994), the Sixth Circuit noted that there is "some disagreement as to the requirement of a nexus between a § 3617 claim and a § 3604 claim[,]" but expressly declined to decide whether the plaintiffs' § 3617 claim depended upon the validity of their § 3604 claim.

And, the Sixth Circuit's later opinion, *Maki*, neither expressly nor implicitly endorsed a dependent construction of § 3617. Instead, the *Maki* court's conclusion that plaintiffs were unable to establish a *prima facie* FHA claim, due to the absence of evidence present in the record indicating that they were denied housing[12], was limited to the particular facts of that case.

The Sixth Circuit has recognized that the specific proof required to establish a *prima facie* case of housing discrimination varies with the factual circumstances of a case, and that a plaintiff can successfully meet their *prima facie* burden if there is sufficient evidence leading one to conclude that plaintiff suffered an adverse housing action under circumstances giving rise to an inference of unlawful discrimination. *See Lindsay v. Yates*, 578 F.3d 407, 416 (6th Cir. 2009). Conversely, a plaintiff fails to establish a *prima facie* case if unable to present aforementioned evidence.

Thus, in *Maki*, the Court held that the plaintiffs failed to establish their *prima facie* case not because evidence indicating whether housing was made unavailable or denied was required to sustain a claim under the FHA, but because the lack of such evidence precluded a reasonable juror from finding merit in plaintiffs' allegations of being forcibly removed from their home as a result of Defendants' actions. *See Maki*, 88 F.3d at 364-65.

_____

[12] *Maki*, 88 F.3d at 364. ("The *Makis* left voluntarily.")

27

(1:10 cv 0887)

In the instant case, because Hidden Village's FHA claims are rooted in allegations of harassment—not eviction, the absence of evidence indicating protected class members were evicted would have no logical bearing upon whether Hidden Village has presented sufficient evidence to support its harassment-based FHA claims.  Accordingly,  *Maki* is inapposite and does not support dismissing Hidden Village's § 3617 claim.

Additionally, Defendants' principal case—*AHF*—fails to provide the Court with persuasive authority concerning whether a § 3617 claim could provide a stand-alone basis for liability.  The *AHF* Court held that "§ 3617 applies only to conduct that implicates the availability of housing rather than merely habitability."  *See AHF*, 633 F.Supp.2d at 303.  This opinion was derived primarily from Seventh Circuit's opinion in *Halprin*, which implied that an independent violation of  § 3617 could not exist.[13]  However, *Halprin's* opinion on this matter has since been overruled by *Bloch v. Frischholz, 587 F.3d 771 (7th Cir. 2009)*.

In *Bloch*, the Seventh Circuit revisited the issue of whether a § 3617 claim could survive absent "a violation of § 3604 or any other FHA provision."  *Id.* at 781.  The Court noted that although it had held, in some instances, that §§ 3604 and 3617 were co-extensive, the present case suggested a different construction.  *Id.*  The Court stated that, in light of its view that § 3604 prohibits discriminatory evictions, it follows that attempted discriminatory evictions would violate § 3617's  prohibition against interference with § 3604 rights.  *Id.* at 782.

---

[13]  *See AHF* 633 F. Supp. 2d at 302-03; *see also Cox*, 430 F.3d 734, 795 (5th Cir. 2005); and *Reule*, 235 Fed. Appx. 227-28 (5th Cir. 2007).

(1:10 cv 0887)

The *Bloch* Court provided several reasons for construing § 3617 in this manner. In analyzing the statutory text of the FHA, the Court noted that an alternative conclusion—rejecting the independence of a § 3617 violation—would make § 3617 entirely duplicative of the other FHA provisions. *Id.* Moreover, the Court stated that interpreting § 3617 to cover a more expansive range of conduct was consistent with both (1) congressional intent in enacting the FHA and (2) HUD's regulations, which also interpret § 3617 to cover post-acquisition discrimination that does not result in eviction. *Id.* at 783.

The Court finds this reasoning persuasive. Moreover, *Bloch's* conclusion that a § 3617 claim may remain viable, in the absence of a § 3604 violation, is consistent with at least two decisions within this Circuit. *See Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489, 497 (S.D. Ohio 1976) (rejecting defendants' contention that "§ 3617 is 'triggered only after a finding of discrimination under one of the therein enumerated prior sections'" because their interpretation of the act violates the rule of statutory construction holding that "whenever possible, each provision of a legislative enactment is to be interpreted as meaningful and not as surplusage"); *see also Byrd v. Brandeburg,* 922 F.Supp. 60 (N.D. Ohio 1996) (finding a violation of § 3617 without examining whether plaintiff's housing was made unavailable or denied).

Consequently, this Court, like the *Bloch* Court, rejects the averment of Defendants. Hidden Village's failure to produce evidence that housing was unavailable or denied *does not* doom its § 3617 claim.

29

(1:10 cv 0887)

## 2.  Whether Hidden Village has presented sufficient evidence to sustain/establish a  § 3617 claim.

Having determined that Hidden Village's failure to allege or produce evidence that

housing was made unavailable or denied does not preclude it from pursuing a § 3617 claim, the

next inquiry for the Court is whether the evidence that Hidden Village has presented is sufficient

to sustain the claim.  The Court answers this question by analyzing the evidence pursuant to the

foregoing test:

In order to prevail on a § 3617 claim, the plaintiff must show that (1) its tenants are  a

protected class under the FHA; (2) plaintiff aided or encouraged the tenants of the protected class

in the exercise or enjoyment of their fair housing rights; (3) defendants were motivated in part by

an intent to discriminate; and (4) defendants coerced, threatened, intimidated, or interfered with

plaintiff on account of plaintiff having aided or encouraged the tenants in the exercise or

enjoyment of their fair housing rights.  *See People Helpers,* 789 F. Supp. at 732; *East-Miller v.*

*Lake County Highway Dep't,* 421 F.3d 558, 563 (7th Cir. 2005).

### a.  Factors One and Two of the § 3617 Test

A mere cursory review of the facts reveals that Hidden Village has met the first and second

elements of the test: Hidden Village provided housing for YRP–an organization–servicing

primarily African American youth.  *See People Helpers*, 789 F. Supp. at 732 (finding that plaintiff

satisfied the first two factors of the test because plaintiff  "clearly aided handicapped and black

individuals in securing access to housing" and "[b]oth blacks and handicapped persons are

protected classes under the Fair Housing Act").

30

(1:10 cv 0887)

However, determining whether Plaintiff has met the third and fourth elements commands the Court to engage in a more detailed and sensitive inquiry as both elements require proof of discriminatory intent.  *See Id.*; *see also Mich. Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994) (denying § 3617 claim partially because the record lacked any indication of discriminatory animus).

### b.  Factor Three of the § 3617 Test: *McDonnell Douglas* Analysis

In the absence of direct evidence, establishing that Defendants acted with discriminatory intent—the third factor of the § 3617 test—can be accomplished indirectly through the inferential burden shifting framework set forth in  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).  Under that framework, plaintiff  has the burden of presenting sufficient evidence to make out a *prima facie* case of discrimination.  *Id.* at 802.  If the plaintiff succeeds, the burden shifts to the defendant to present evidence of a legitimate, non-discriminatory reason for the challenged actions.  *Id.* at 802; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981).  The plaintiff may then show that the reason offered by the defendant is merely a "pretext" for unlawful discrimination.  *McDonnell Douglas*, 411 U.S. at 804.

### i.  *Prima Facie* Case

With respect to the first burden, allocated to the plaintiff, the "Supreme Court has emphasized that the *prima facie* standard offered in *McDonnell Douglas* was not 'inflexible' and that the specific proof required of the plaintiff in that particular case was 'not necessarily applicable in every respect in differing factual situations.'" *Lindsay,* 578 F.3d at 416 (Sixth Circuit citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 n.6 (1981)).

31

(1:10 cv 0887)

Thus, in overruling a denial of a motion for summary judgment on a § 3604 federal

housing discrimination allegation the Sixth Circuit, among others, ruled that, " [a] prima facie

case is established whenever the actions taken by the [defendant] lead one to reasonably 'infer, if

such actions remain unexplained, that it is more likely than not that such actions were based on

discriminatory criterion' such as race." *See Lindsay*, 578 F.3d at 418 (citing *Furnco Const. Corp.

v. Waters*, 438 U.S. 567, 577 (1978)).[14]

The Sixth Circuit explained that "the additional evidence" which can be relied upon to

establish a *prima facie* claim depends on the attendant facts and circumstances.  *Id.*  A summary

of Hidden Village's allegations against all of the Defendants is as follows:

> Defendants were and continue to engage in a pattern and practice of official
> governmental conduct which includes, but is not limited to, (a) urging and coercing
> a "voluntary" mass exodus of African-American tenants from Hidden Village by
> Defendant George in his official and personal capacity (b) executing mass raids of
> units rented by African-American citizens (c) threatening the owners and program
> officials (d) insisting zoning noncompliance despite a unanimous finding of the
> planning commission from which the Defendant took no appeal (e) using police
> power to intimidate individual residents without cause, and (f) attempting to
> intimidate the owners of Hidden Village by conducting building inspections and
> citing violations which are unfounded.

ECF No. 1 at 22.  Thus, because the factual basis of Hidden Village's § 3617 claim revolves

around municipal action resulting from alleged discriminatory decision-making, the Court will

determine whether Hidden Village has established its *prima facie* case by analyzing the evidence

pursuant to the following checklist of considerations for establishing that governmental action was

---

[14] "[S]o long as 'additional evidence' exists . . . that indicates discriminatory intent in 'light of
common experience,' the required 'inference of discrimination' can be made in satisfaction of
the prima facie case.*"  Lindsay*, 578 F.3d at 418.

32

(1:10 cv 0887)

motivated by discriminatory intent espoused by the Supreme Court in *Arlington Heights v. Metro. Hous. Dev. Corp*, 429 U.S. 252, 266-268 (U.S. 1977):  (1) the racial impact of the decisions, (2) the specific sequence of events leading up to the challenged decisions–including departures from the normal procedural sequence; and (3) the administrative history of the decisions.  *See Id.*; *see also Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49-51 (2nd Cir. 2002)* (stating that a *prima facie* case of discrimination under the FHA and ADA is established by presenting evidence that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive" and also determining whether the plaintiff met this burden by analyzing the *Arlington Heights* factors); *see also Turner v. City of Englewood*, 195 Fed. Appx. 346, 353 (6th Cir. 2006) (adopting *Reg'l Econ. Cmty.* court's *prima facie* standard under the ADA and likewise determining whether the plaintiff met this burden by analyzing the *Arlington Heights* factors).

### a.  Racial Impact

The Supreme Court states that the "important starting point for assessing discriminatory intent under *Arlington Heights* is the impact of the official action whether it bears more heavily on one race than another." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (U.S. 1997)  (internal quotations and citations omitted*).*  Following the Supreme Court's instruction, this Court finds that in the instant case, there is a permissible inference that at least some of the municipal action, highlighted by Hidden Village, had a disproportionate impact on African Americans.

33

(1:10 cv 0887)

_Lakewood Police Department Correspondence_:  For instance, Lakewood Police Department correspondence, issued on behalf of police management, instructing officers to document any contact with YRP members and to preferably arrest or issue citations when witnessing violations by the Program's participants (ECF Nos. 52-16 and 52-17) seemingly support Hidden Village's allegation that its African American tenants were disproportionately subjected to police harassment,[15] in light of the fact that YRP's clientele was 80% African American (ECF No. 52-4 at 4).  This holds true, even if similar correspondence was issued for other Lakewood properties, based upon Withers' and Jacobs' testimony—indicating that only the African American YRP residents reported problems with police harassment.  ECF Nos. 52-4 at 22 and 52-3 at 17.  Moreover, claims by YRP staff that the Program's clients were issued tickets by Lakewood police for jaywalking, walking on train tracks, and failing to have a license on a bike provide further evidence that the aforementioned policy documented in the correspondence was, in fact, implemented and had a discriminatory effect.  ECF Nos. 52 at 15;52-7 at 2; and 52-3 at 16.

_Lakewood Inspections_:  Additionally, the May 22, 2007, joint inspection by Lakewood officials likewise points to municipal action that disproportionately impacted African Americans.  According to Withers' testimony, the team of city officials only inspected Buildings C and D of the compound—which were buildings occupied exclusively by the predominately African

---

[15] Hidden Village states that the Defendants engaged in a "pattern and practice of coercion and intimidation on the basis of the race of some of the residents by using the police to further the intimidation."  ECF No. 1 at 19.

(1:10 cv 0887)

American YRP residents.  ECF Nos. 52 at 12 and 52-4 at 21.

Additionally, even conduct that, when considered independently, seemingly failed to cause a disproportional impact—such as Defendant Barrett's zoning determination (ECF No. 52-13) and former Mayor George's letter (ECF No. 52-24), both of which ordered the removal of YRP from Hidden Village Apartments—collectively, had a disproportional impact on African Americans who comprised 80% of YRP's participants.  When considered together, these support Hidden Village's averment that the Defendants' organized a campaign of harassment against a predominately African American group.

**b.  Sequence of Events**

The second factor—specific sequence of events leading up to the official action–including departures from the normal procedural sequence—creates an inference of discriminatory intent.

*Barrett's Zoning Determination*:  Barrett testified that he went to the February 14, 2006 meeting, involving city officials and representatives of Hidden Village and YRP/ LMM with the intent to advise YRP that their proposed use violated the City of Lakewood zoning code.  ECF No. 52-6 at 9.  His admission is problematic, to say the least, given the fact that the February meeting constituted the first assembly of the various parties.  According to Barrett, his opinion concerning zoning non-compliance was  based upon material describing the YRP that he had reviewed prior to the meeting.  ECF No. 52-6 at 7.  This revelation does not diminish the significance of Barrett's testimony.  The meeting provided an opportunity for Barrett and other City officials to supplement their knowledge, resolve doubts, and gain more detailed information regarding the Program.  Thus, the appearance of Barrett's willingness to disregard the opportunity to become better

35

(1:10 cv 0887)

informed about YRP lends credence to Hidden Village's claim that his zoning determination was motivated by discriminatory intent. *See Valley Hous. LP v. City of Derby*, 2011 U.S. Dist. Lexis 83689, *72-73, 75 (D. Conn. 2011) (stating that a defendant's "drafting of the decision to deny plaintiffs' appeal before the meeting without discussion with the other ZBA members and without showing them a draft prior to reading it into the record . . . support a conclusion of discriminatory decision-making" and indicating that a Zoning Board's reliance upon an interpretation of the zoning regulations without having probed the research supported a finding of discrimination).

*Lakewood Inspections*:  Moreover, the inspections by Lakewood officials raise additional red flags.  Hidden Village highlights that the joint inspection occurred a mere six days after the City and YRP held a meeting that was characterized as "heated" by a YRP representative and, during the meeting, YRP was asked to move.  ECF No. 52-4 at 25-27.  The unannounced nature of the visits also underscored a deviation from the City's typical procedure.  Lieberman testified that as a property owner in Lakewood since 1986, he had always been notified in advance for any City inspections.  ECF Nos. 52 at 19 and 52-1 at 11.

Additionally, Scott Gilman, the City's Fire Inspector, testified that a joint inspection of property like Hidden Village is typically conducted when there is a change to the fire protection, new occupancy permit is required, or when they receive a complaint from residents.  When asked to pinpoint the trigger causing the joint inspection of Hidden Village, Gilman had no firm answer. He admitted that he would not determine whether YRP was in compliance with fire or safety codes because the "building department" was not sure of the use of the building.  He

(1:10 cv 0887)

acknowledged not knowing why the police were present.

While so much of what occurred during the initial inspection appears suspiciously out of the ordinary, what is most striking about Gilman's testimony is his stated purpose for participating in the joint inspection and subsequent inspections.  Gilman testified that he was attempting to determine the complex's appropriate use classification—whether Hidden Village should be classified as a residential or institutional use—in order to identify the required level of fire protection for the building.  However, despite this stated purpose for the inspection, Gilman repeatedly conceded that the department responsible for determining such usage is the Building Department.  ECF No. 52-9 at 6, 12-13.  Barrett, former Building Commissioner, further testified that he had previously informed Gilman that Hidden Village held a residential use classification.  ECF No. 52-6 at 16.  Thus, Gilman's actions likely reflect that the "raids" constituted not only a procedural deviation from the City's custom, but also a substantive departure as well.  *See Arlington Heights*, 429 U.S. at 267 ("Substantive departures too may be relevant, particularly if the factors usually considered important  by the decisionmaker strongly favor a decision contrary to the one reached.").

*Lakewood  Police Department Correspondence*: Sergeant Favre testified that the police department generally permits officers to exercise a degree of discretion when issuing citations and making arrests.  ECF Nos. 52 at 14 and 52-5 at 8.  Thus, the issuance of correspondence suggesting that officers abandon that discretion when encountering YRP tenants also denotes a substantive departure from procedure.

37

(1:10 cv 0887)

### c.  Administrative History

The Sixth Circuit instructs the Court to "pay particular attention to legislative or administrative history,"—the third factor— "'especially where there are contemporary statements by members of the decisionmaking body, minutes of meetings, or reports.'" *See Turner v. City of Englewood*, 195 Fed. Appx. 346, 354 (6th Cir. 2006) (citing *Arlington Heights*, 429 U.S. at 268).

*Evidence of General Discriminatory Decision-Making*:  In this case, certain comments provide circumstantial evidence of discriminatory decisionmaking.  For example, Barrett testified and commands that Sergeant Favre commented that he was concerned with the high percentage of African American members in the YRP Program.  ECF No. 52-6; ECF No. 59 at 21.  And, Gilman admitted that it was not "usual" to ask residents to step outside while a joint inspection took place.  The residents of Buildings C and D were, Gilman admitted, "standing out behind the building," during the joint inspection.  ECF No. 59-9 at 6-7.

In the context of employment discrimination, the Sixth Circuit has devised the following opinion regarding the relevancy of such obviously discriminatory remarks:

> Although discriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination, the comments of a non decisionmaker are not categorically excludable. Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add *color* to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.

*Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 356-57 (6th Cir. 1998) (internal

(1:10 cv 0887)

quotation marks and citations omitted) (emphasis added).

The Court further stated that "evidence of . . . a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment. . . . This is especially true when the discriminatory statement is not an off-hand comment by a low-level supervisor but a remark by a senior official evidencing managerial policy." *Id.* (internal quotation marks and citations omitted).

The Sixth Circuit instructs this Court to therefore evaluate such statements by "evaluat[ing] factors affecting the statement's probative value, such as the declarant's position in the [organization's] hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged [ ] action, as well as whether the statement buttresses other evidence of pretext." *Id.* at 357 (internal quotation marks and citation omitted); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383 (6th Cir. 2009).

Thus, even if the Court assumes without deciding that Sergeant Favre was a non-decisionmaker in any of the challenged actions, Sergeant Favre's statement still aids Hidden Village in establishing its *prima facie* case.  His position as Special Assistant to then Mayor George, an alleged decisionmaker, creates an inference that Favre played some influential role in shaping the City's interaction with Hidden Village.  Even then Mayor George arguably acknowledged Favre's prominent status when he brazenly communicated to a Lakewood employee, that "any policy from this Administration regarding [Hidden Village] will be directed

39

(1:10 cv 0887)

through [Favre]."[16]  ECF No. 52-21.  Accordingly, because of Favre's position within the Mayor's office, his biased remark could be particularly probative of defendants' alleged discriminatory decisionmaking.  *See Risch*, 581 F.3d at 393 ("Discriminatory statements made by individuals occupying managerial positions can be particularly probative of a discriminatory workplace culture.") (citations omitted).

        *Barrett's Zoning Determination*: Also significant is the context in which Sergeant Favre's remark was uttered.  According to Barrett's testimony, Sergeant Favre told Barrett of his concern that "a lot of blacks" were participants in YRP, and Barrett similarly revealed his concern to Sergeant Favre regarding the incompatibility of YRP's tenancy to the City's zoning ordinance.  ECF No. 52-6 at 3-4.  Given the proximity of this conversation to the February 12, 2006 meeting, which Barrett attended, having pre-determined the lawfulness of YRP's occupancy, assuredly adds "color" to Barrett's subsequent decision ordering the expulsion of YRP.[17]

_____

[16] Former Mayor George's comment punctuates Sergeant Favre's status and, thus, negates the defense claim that Sergeant Favre's "alleged comment was made only to Mr. Barrett and the comment was not made as part of a decision[-]making process that resulted in any governmental actions.

[17] *See Risch*, 581 F.3d at 393 (finding a non-decisionmaker's discriminatory remark suggestive of an atmosphere hostile to the promotion of female officers partially because the remark was made in the context of  a meeting attended by a decisionmaker in which two female officers were denied promotions); *see also Hamm v. City of Gahanna*, 109 Fed. Appx. 744, 748 (6th Cir. 2004) (finding alleged discriminatory remarks were not evidence of intentional discrimination partially because the decisionmaker who overheard these remarks voted in support of plaintiffs' request, and there was no evidence that any other decisionmaker overheard the remarks).

40

(1:10 cv 0887)

*Evidence of General Discriminatory Decision-Making*:  Coupled with Sergeant Favre's remarks are notes from a meeting, dated January 18, 2007.[18]  In addition to identifying all three individually named defendants and Captain Hassing, and Lieutenant Ciresi along with other Lakewood City officials presumably as the meeting's attendees, the notes suggest that during the meeting, the focal point of discussion among the City officials was how to expel the YRP from the City of Lakewood.  Indeed, one of the documents contains a list of what appears to be proposed methods to facilitate YRP's removal:[19]

> -Can we go back to planning commission?

> -can we appeal decision of P.C. [planning commission]

> -Nuisance Laws

> -Gilman 'program'  ~Fire Safety~

ECF No. 52-28.  When viewed in the context of other evidence present in the record, the meeting notes bolster Hidden Village's allegation that the City's actions were strategic, and therefore not based upon a legitimate nondiscriminatory purpose.

*Lakewood Police Department Correspondence*:  Hidden Village claims that "City officials initiated a concentrated effort to establish YRP as a criminal nuisance . . . [by means of] document[ing] a certain number of arrests within a concentrated time period."  ECF No. 52 at 13-

---

[18] The Court notes that only one of the documents provide the date of January 18, 2007.  ECF No. 52-28.  The other indicates a date of January 18, 2006.  ECF No. 52-27. But this appears to be a typographical error, considering that YRP did not become tenants of Hidden Village Apartments until April of 2006.

[19] Plaintiff's brief in opposition does not identify the author of the notes.

(1:10 cv 0887)

14.  The "Departmental Correspondence" instructing police to document and preferably arrest

YRP residents handily aligns itself with Hidden Village's nuisance theory.  ECF Nos. 52-4 at 22

and 52-3 at 17.  The earlier referenced meeting notes make explicit reference to "nuisance laws"[20]

and appear to corroborate Hidden Village's claim that the City employed the tool of harassment as

a means to expel the YRP.

Lakewood Inspections:  Moreover, the meeting notes' reference to Gilman and "'program'

~Fire Safety~" (ECF Nos. 52-27 and 52-28), bolster Hidden Village's allegation that City

officials' May 22, 2007 "raid" and subsequent  inspection visits constituted one of the strategies to

expel Hidden Village.  An email, dated November 8, 2006, from Sergeant Favre to then Mayor

George seems to also support this conclusion.  In the email, Sergeant Favre appears to discuss

strategies to expel the YRP when he writes that he is "still waiting to hear further from Gilman on

the fire code stuff."  ECF No. 52-22.

### d.  Individual Defendants

Equally important to note is that in addition to the evidence already discussed, Hidden

Village has provided "additional evidence" against the individually named defendants, creating a

permissible inference that they each played an active role in the municipal action, and, therefore,

acted with discriminatory intent.  Such evidence is sufficient to establish a *prima facie* case

against each individual Defendants.  *Lindsay*, 578 F.3d at 418.

*Mayor George*:  An email dated April 13, 2006, from former Mayor George to many City

_____

[20]  ECF No. 52-28.

42

(1:10 cv 0887)

officials across various departments,[21] wherein he boldly proclaims the Administration's policy

regarding Hidden Village and YRP, provides a strong evidentiary basis supporting an inference

that the former Mayor was not a passive participant in the City's actions.[22]  He states:

> It has come to my attention that the [LMM/YRP] is attempting to locate their re-entry program group home into the City of Lakewood in a location which is not zoned for such use. As no member of the [LMM] has been in contact with me regarding this issue, so let me be clear to as the Administration's policy.  Zoning laws in this city will be strictly enforced.  Attempts to circumvent or ignore such laws will not be tolerated.  As the proposed location of the [LMM/YRP] facility is not located in a properly zoned area . . . the Administration opposes the [Hidden Village Apartments] location.

ECF No. 52-11.

Hidden Village also highlights then Mayor George's Removal Letter to the President of

LMM, pronouncing that he would personally seek to have YRP removed from Hidden Village at

the earliest possible time[23] as evidence of not only his alleged involvement , but also that his

involvement was motivated by discriminatory intent.  Mayor George, in that former capacity,

---

[21]  While the document fails to provide an exhaustive list of the recipients to the email, the document does indicate that this email was sent to persons within the Legal, Building, and Health Departments of Lakewood.  ECF No. 52-11.

[22]  The Court also notes that the Mayor's email was sent in April of 2006, approximately a month *before* Barrett issued his official zoning determination finding YRP's tenancy to be in violation of Lakewood's zoning code.  ECF No. 52-13.  This fact could be construed as evidence of former Mayor George's involvement with Barrett's zoning determination.

[23]  The letter states: "I want you to know that I will seek to have the program removed from Lakewood at the earliest possible time.  I am telling you now so that whatever lease or contract obligations that might change with the anniversary of first occupancy can be determined to LMM's best alternatives and with at least the same amount of time that LMM gave to the City of Lakewood before moving in despite our, objections and without further notice."  ECF No. 52-24 at 2.

43

(1:10 cv 0887)

testified that this letter reflected the policy of his administration as of February 2007.  ECF No. 45-1 at 106-07.

Additionally, one of the Mayor's concerns raised in the letter, was the increased criminal activity near Hidden Village since YRP's arrival.  He states:  "[I]ncidents in the immediate neighborhood requiring police intervention have more than doubled since the LMM program began at Hidden Village."  ECF No. 52-24 at 2.  While Defendants contend that the rise in crime was the impetus behind the Mayor's demand letter (ECF No. 49 at 27), this argument is dubious at best, in light of both the evidence present in the record already discussed and Chief Malley of Lakewood Police Department's testimony indicating that during the first five months, April–August 2006, there had been no significant incident involving YRP tenants (ECF No. 44-1 at 39) that documents compiled by the Police Department actually showed that crime went down in 2007 after YRP moved into the area (ECF Nos. 44-1 at 119-120 and 52-26).

*Fitzgerald and Barrett*:  As to Fitzgerald and Barrett, Hidden Village points to their participation in various YRP related meetings as evidence of their active role in the alleged discriminatory conduct.  ECF No. 52 at 28-29.  Indeed, as previously discussed, the January 18, 2007 meeting notes suggest Barrett and Fitzgerald attended a meeting, wherein City officials discussed strategies to expel YRP from Lakewood.  ECF Nos. 52-27 and 52-28.  If the notes are found to implicate the Defendants, Barrett's attendance would be particularly  problematic.  He testified that after the Lakewood Planning Commission overruled his zoning code determination

44

(1:10 cv 0887)

on July 6, 2006,[24] his role, as it related to the YRP, albeit "zoning wise," had ended. ECF No. 52-6 at 13. *See* *Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

Additionally, Hidden Village highlights Fitzgerald's testimony indicating that Lakewood's Building Department was asked to assist with the "raid" and it was at his direction that a building inspector participated. ECF. No. 43-1 at 43-44. An email from Sergeant Favre to then Mayor George, dated January 19, 2007—informing the former Mayor that Fitzgerald believed that he had a "new, untried zoning angle for our problem" and wanted to discuss his strategy with the Mayor, Favre, and Lakewood's Law Department "in time for the next meeting"—provides further support of Fitzgerald's involvement.[25] ECF No. 52-23.

At bottom, the evidence discussed herein suffices to establish Hidden Village's *prima facie* case against Lakewood and the named Defendants in their individual capacities.

### ii. Legitimate Non-Discriminatory Reason & Pretext

As indicated above, once the plaintiff presents evidence of a *prima facie* case of housing discrimination on summary judgment, the burden of production of evidence shifts to the defendant to offer admissible evidence of a legitimate, non-discriminatory reason for the housing decision made. If the defendant does so, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful

---

[24] ECF No. 52-14.

[25] Mayor George, in his former role, testified that the "problem" noted in the email "probably" referred to Hidden Village Apartments. ECF No. 45-1 at 102.

(1:10 cv 0887)

discrimination.  *See Lindsay*, 578 F.3d at 420.

"[A]n indirect evidentiary showing that the employer's explanation is not credible"

satisfies plaintiff's burden of establishing pretext.  *Id.* at 421 (quoting *Peters v. Lincoln Elec. Co.*,

285 F.3d 456, 470 (6th Cir. 2002)).  And "[a] discrimination case is submittable to a jury on the

credibility of the defendants' explanation if the plaintiff offers evidence that could establish by a

preponderance of the evidence that the proffered reasons had no basis in fact or did not actually

motivate the adverse housing decision."  *See Lindsay*, 578 F.3d at 422 (citing to *Manzer v.*

*Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

In the instant case, although the Court finds that Defendants have met their subsequent

burden of production by providing evidence to support that all challenged actions taken by the

Lakewood Defendants were predicated upon legitimate non-discriminatory grounds, the Court

concludes that Hidden Village has pointed to sufficient evidence present in the record that raises a

genuine issue of material fact as to whether the Defendants' proffered reasons were a pretext for

discrimination.  *See Lindsay*, 578 F.3d at 422.  As explained below, the indirect evidence present

in the record creates an inference that Defendants' proffered reasons are not credible, *i.e.*, that

their legitimate non-discriminatory reasons for their actions did not actually motivate the

Defendants' conduct.  *Id*.

*Barrett's Zoning Determination*:  First, Defendants argue that Barrett's decision to issue a

zoning violation to Hidden Village was properly based upon a reasonable interpretation of the

zoning code, and therefore his actions cannot be said to be motivated by discriminatory intent.

After reminding the Court that only a residential use rather than institutional use of property is

46

(1:10 cv 0887)

permitted under Lakewood's zoning code, Defendants aver that Barrett's finding of an
institutional use of Hidden Village was reasonable in light of the following characteristics of
YRP:  (a) the Program required 24 hour supervision; (b) an entire apartment building housed the
enrollees; (c) the building included conference rooms and office space; and (d) YRP enrollees
were subject to a curfew restricting their ability to enter and exit the apartment buildings.  ECF
No. 49 at 21.

Defendants are correct in noting that Barrett's determination appears reasonable, however,
a reasonable juror could just as likely reach the opposite conclusion or find that Barrett's
interpretation was not sincerely held.[26]  For instance, the fact that the Program imposed the
aforementioned restrictions upon its participants, including curfew and constant supervision,
could fail to aid Defendants' argument of reasonableness.  After all, the YRP's participants were
youth, and YRP's role of providing housing and additional transitional living assistance to its
youth participants was seemingly parental in nature.  Additionally, as Hidden Village has
highlighted (ECF No. 52 at 28), the zoning code expressly allows for group homes. [27]  Moreover,
when viewing Barrett's interpretation in light of the previously mentioned evidence supporting

---

[26] *See Smith v. City of Chicago*, 2002 U.S. Dist. Lexis 14118, *26-27 (N.D. Ill. 2002) (stating that
"the plain language of these ordinances casts some doubt on the validity of the City's
interpretation. But the question is not whether the City's interpretation is correct, but whether the
City adheres to that interpretation, regardless of [ ] race . . .").

[27] The Code states: "no building or premises shall be used or established which is designed,
arranged, or intended for other than a medium density multiple-family residential building, a low
density multiple family residential building, a single, or two-family dwelling, adult family home,
adult group home, or cluster house development."  ECF No. 52-13.

(1:10 cv 0887)

Hidden Village's allegation of purposeful and discriminatory municipal action to expel YRP from

Lakewood, a rational fact finder could conclude that Barrett's proffered reason is not credible.

*See Smith & Lee Assocs. v. City of Taylor, 102 F.3d 781, 792 (6th Cir. 1996)* ("The City's

interpretation of the ordinance cannot serve as evidence of intentional discrimination unless the

City's interpretation strained the plain meaning of a statute to further its discriminatory animus.").

*Mayor George's Removal Letter*:  Defendants contend that former Mayor George's

"relocation request" stemmed from and was issued out of a concern for the safety of the YRP

residents.  ECF No. 49 at 21-22.  Defendants argue that the location of Hidden Village

Apartments was problematic as the area was not only secluded and had poor lighting, but also

contained a high rate of criminal activity.  Defendants assert that these attributes prevented the

area from being properly supervised.  Defendants state, "[d]ue to these potential threats to YRP

enrollees, Lakewood officials believed that Hidden Village was not a suitable facility to house

YRP."  ECF No. 49 at 21-22.   Additionally, Defendants argue that YRP staff were uncooperative

with police inquiries concerning potential criminal activity.  ECF No. 49 at 27.  They state that

this, too, motivated George, in his former role, to demand YRP's removal.  ECF No. 49 at 21-22.

Lastly, Defendants, using this same justification, contend that the letter was also a result of

legitimate concerns regarding zoning compliance.

The Court finds, however, that the evidence present in the record raises a genuine issue of

material fact as to whether the Mayor's proffered reasons were a pretext for unlawful

discrimination.  Foremost, Defendants' averment that his motivation stemmed from concern for

the YRP youth is undermined by both the tone of the letter and the evidence present in the record

48

(1:10 cv 0887)

which create an inference that youth safety was the least of then Mayor's concern.  The refrain in the letter is the burden YRP has placed upon the shoulders of the City of Lakewood.[28]  The letter identifies one of those burdens as being crime attributed to YRP participants.  He states that the incidents in the immediate neighborhood requiring police intervention have more than doubled since YRP moved to Lakewood.  ECF No. 52-24 at 1.  And, although Mayor George, in his former role, is careful not to attribute all of the criminal incidents to YRP youth, he practically insinuates the same by stating that "confirmation of discipline within the program has been lacking[.]"  ECF No. 52-24 at 2.

Additionally, the letter's emphasis on crime could plausibly be viewed as evidence of racial bias against African Americans.  *See Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 636-637 (6th Cir. 2001) (finding that statements could be seen as expressions of racial bias against African Americans because [the statement] mirrored racial stereotypes of African Americans).  As acknowledged by the Sixth Circuit, "racial stereotypes prevalent in our society associate blacks with crime, drugs, and lower class status."  *Id.* at 636.  Hence, a reasonable juror could conclude that the former Mayor George's letter reflected this stereotypical

---

[28] The reference line in the letter states: "Continuing problems and unfair burdens upon the City of Lakewood[.]"  ECF No. 52-24 at 1.  The body of the letter states:  "Good intentions and sincere efforts are insufficient to outweigh the burdens that the program has placed upon the City, its citizens, and particularly the neighbors of the Hidden Village location."  ECF No. 52-24 at 1.
    In the second to last paragraph, the letter states:  "Nevertheless, it is my belief that LMM must face the reality of what this program has done to the City of Lakewood, and LMM must assess whether it is fair to impose these burdens upon the Hidden Village neighborhood in the months ahead, particularly given the City's expressed concerns of longstanding that have unfortunately proved true.  ECF No. 52-24 at 3.

(1:10 cv 0887)

view of African Americans and that Defendants' proffered reasons are pretextual and rooted in discriminatory animus. This exaction is especially provocative given the absence of evidence present in the record indicating that YRP's participants were largely responsible for the area's crime, and the existence of evidence present in the record indicating that crime had actually decreased in the locale of YRP in 2007.[29] ECF No. 44-1 at 119-120.

*Lakewood Inspections*: Defendants contend that the purpose of the inspections was to verify that all health and safety issues were properly addressed and to determine the appropriate fire code classification for the YRP facilities. ECF Nos.59 at 9; 59-5 at 2-4; 59-6 at 2; and 49 at 15. Consequently, they conclude, the record establishes that the inspections were a result of "legitimate non-discriminatory health concerns." ECF No. 49 at 22. The Court disagrees.

There is sufficient evidence present in the record casting doubt upon Defendants' proffered reason for the raid and subsequent inspection visits. As previously mentioned, both the sequence of events leading up to the inspections and evidence indicating that Lakewood officials departed from customary practice support a finding of pretext. *See Arlington Heights*, 429 U.S. at 267-268. For example, Gilman's testimony, by itself, severely undermines the credibility of Defendants' articulated reason. Gilman's assertion that he participated in the inspection to determine Hidden Village Apartments' appropriate use classification is belied by: (1) his admission that the Building Department is responsible for that task (ECF No. 52-9 at 6, 12-13),

---

[29] Defendants also contend that then Mayor George had a legitimate concern regarding zoning compliance. However, this explanation could easily be dismissed given that at the time he issued his letter, Hidden Village was found to be in zoning compliance by the Lakewood Planning Commission.

(1:10 cv 0887)

and (2) Barrett's testimony indicating that Barrett had previously informed Gilman of the

complex's appropriate use classification (ECF No. 52-6 at 16).

Additionally, Defendants proffer is refuted by Hidden Village's assertion that the joint

inspection team only inspected Buildings C and D which were exclusively occupied by YRP

enrollees.  ECF No. 59 at 9.  Their proffer relies upon the testimony of Gilman, who stated that

Building B, a non-YRP building, was also inspected.  ECF No. 59-5 at 5.  However, this

conflicting evidence only serves to buttress Hidden Village's argument that Defendants' motion

for summary judgment should be denied as the Court finds that there is a genuine issue of material

fact concerning whether Lakewood Officials only inspected YRP occupied buildings.[30]

*Lakewood Police Departmental Correspondence*:  Additionally, Defendants deny there

were ulterior discriminatory motives behind the police correspondence.  Specifically, Defendants

eschew Hidden Village's allegation that the correspondence, recommending officers arrest and

issue citations to YRP participants, were issued as a means to establish YRP as a criminal

nuisance.  In support of their position, Defendants point to the sworn testimony of both Chief

Malley and Sergeant Favre of the Lakewood Police Department.  According to Chief Malley's

testimony, the departmental correspondence was issued as an attempt to determine whether YRP

enrollees were the cause of the increase in criminal activity in the area of Hidden Village.  ECF

No. 59 at 7.  Defendants argue that Sergeant Favre's testimony indicated that the correspondence

---

[30]As written elsewhere, Gilman admitted that Building B was only partially searched.  Those
buildings exclusively occupied by YRP were searched in their entirety.  *See also* ECF 52-17
(Lakewood Police memo identifying the buildings–C and D–occupied by YRP participants).

(1:10 cv 0887)

targeted YRP because of the record keeping problems posed by the Hidden Village Apartments complex and neighboring properties.  ECF Nos. 59 at 8 and 59-1 at 15-16.  Additionally, Defendants highlight that Chief Malley testified that other apartment complexes were subjected to similar correspondences and memos.  ECF Nos. 59 at 8 and 59-3 at 3-4.

Defendants also instruct the Court that a further evaluation of the criminal nuisance ordinance demonstrates that it could not be used by Lakewood to remove YRP from Hidden Village Apartments because the criminal nuisance ordinance required the issuance of a citation against the property owner rather than the tenant.  ECF Nos. 59 at 8 and 59-1 at 10-14. Defendants explain that the criminal nuisance citation allowed the property owner—not the City of Lakewood—to exercise its discretionary judgment regarding how to manage a problem tenant as a citation issued under the criminal nuisance ordinance would have to expressly identify the suite number from tenant from which the citation arose.  Accordingly, Defendants aver that when applied, the criminal nuisance ordinance cannot be used by Lakewood to remove the *entire* YRP. ECF No. 59 at 8.

Nonetheless, a reasonable juror could conclude that Defendants' articulated reasons are pretextual.  As a preliminary matter, the Court notes that Defendants' argument that the nuisance ordinance could not be used to remove YRP from Hidden Village Apartments is devoid of merit. Defendants appear blind to the possibility that repeatedly issuing citations to a landlord, based upon the actions of its tenants, would logically create an incentive for the landlord to evict his problem tenant.  Accordingly, this strategy would produce the same result—the eviction of YRP but by different means.

52

(1:10 cv 0887)

As to Defendants' first articulated reason for issuing the departmental correspondence—to determine whether YRP residents were responsible for an increase in crime, the Court finds that the evidence present in the record casts serious doubt upon the credibility of this reason.  As previously mentioned, Lakewood Police Department's own reports indicate that crime statistics in the area surrounding the Hidden Village properties actually *decreased* in 2007 raises serious doubts concerning whether heightened crime actually occurred.  ECF Nos. 44-1 at 119-120 and 52-26.

Furthermore, Defendants' proffered reasons that the correspondence was issued in response to record keeping problems can reasonably be viewed as pretextual because it fails to explain why the departmental correspondence instructed Lakewood police officers to abandon their discretion and preferably arrest YRP youth.  For example, common sense dictates that if there was a record keeping problem regarding criminal activity, Lakewood Police Department would require its officers to document *all* conduct when encountering *all* persons in the specified problem area; this comports with logic.  What makes little sense, however, is that both documents specifically target YRP residents and instruct that officers are to, preferably, arrest or issue citations to YRP participants rather than everyone causing a problem in the area.  See ECF No. 52-17 and ECF No. 52-16.  This leads one to ponder: How does targeting YRP participants and instructing officers to issue citations to and to arrest YRP participants aid the Police Department in correcting an alleged record keeping problem or aid the police in determining if the cause of the alleged increase in crime could be attributed to the YRP, as alleged?  The Court finds that a reasonable juror could find Defendants' explanation illogical, and, therefore, pretextual.

53

(1:10 cv 0887)

Additional support for this conclusion and Hidden Village's position that the policy was issued as a means to establish YRP as a criminal nuisance is found in the text of one of the documents which expressly states:  "[i]n order for us to use the nuisance ordinance . . . we need documentation . . ." ECF No. 52-16.

The Court's finding that the substantial evidence pointing toward pretext is somewhat tempered by Chief Malley's testimony that there was similar correspondence issued for other properties.  However, on balance, Withers and Brauers' testimony indicating that only African American participants were subjected to police harassment provide a sufficient evidentiary basis for inferring that the arguably neutral policy was applied discriminatorily.  ECF Nos. 52-4 at 22 and 52-3 at 17.

### c.  Factor Four of the § 3617 Test

Finally, in order to satisfy the remaining factor of the § 3617 test, the plaintiff must show that defendant coerced, threatened, intimidated, or *interfered* with plaintiff on account of plaintiff having aided or encouraged tenants in the exercise or enjoyment of their fair housing rights.  *See People Helpers*, 789 F. Supp. at 732; *East-Miller v. Lake County Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005).  Hidden Village argues that it has demonstrated such based upon the evidence present in the record.  The Court agrees.

Even though YRP and its African American clientele was on the receiving end of Lakewood's alleged conduct, there is sufficient evidence presented in the record for a reasonable juror to conclude that the complained of conduct minimally "interfered" with Hidden Village within the meaning of the statute.

54

(1:10 cv 0887)

In *Michigan Prot. and Advocacy Serv., Inc. v. Babin*, the Sixth Circuit interpreted the scope of § 3617 broadly, indicating that establishing interference under the statute did not require a showing of "potent force or duress," and could be triggered by "less obvious, but equally illegal, practices such as exclusionary zoning." *18 F.3d. 337, at 347 (6th Cir. 1994)* (internal quotes and citations omitted).

Additionally, in *Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 236 (6th Cir. 2003)*, the Sixth Circuit examined whether a defendant's conduct rose to the level of a "retaliatory action" cognizable under § 3617.  One of the plaintiffs introduced into evidence a threatening letter from the defendants to her employer, complaining of the plaintiff's housing discrimination lawsuit and asking her employer to do whatever it could to eliminate the situation.  *Id.*  The Court noted that there was also evidence indicating that after the lawsuit was filed, plaintiffs were asked to leave a condominium association meeting and that one of the plaintiffs was reprimanded for allegedly violating several condominium rules.  *Id.*  Contrary to the lower court's ruling, the Sixth Circuit held that this evidence was sufficient to raise a jury question on the retaliation claims.  *Id. at 237.*  Notably, the Court also rejected the lower court's finding that any evidence of legally cognizable injuries was lacking.  The Sixth Circuit concluded that if the jury determined that the defendants violated the FHA, then the plaintiffs had only needed to prove that they suffered a non-quantifiable injury at the hands of the defendants to justify an award of nominal damages.  *Id*

In the instant case, the record points to far more egregious retaliatory behavior, *i.e.*, interference, and damages than that identified in *Hamad*.  As to the alleged municipal actions that were targeted towards Plaintiff, the Complaint indicates that after Hidden Village permitted YRP

(1:10 cv 0887)

to become tenants, the owners of Hidden Village were cited for various building violations by

Lakewood's Building Department.  ECF No. 1 at 19-20.  Also, the record reflects that Barrett's

zoning determination was addressed to Priore of Hidden Village necessitating Hidden Village's

involvement in an appeal and "continued discussions with Defendants' law department."  ECF

No. 1 at 11.

The record supports that Hidden Village experienced incidental interference as well.

Hidden Village argues that Defendants alleged conduct "generally [increased] the cost

of doing business as a landlord in the City of Lakewood (ECF No. 52 at 23), which is a plausible

allegation given that the evidence present in the record makes obvious that Hidden Village was

anything but an absentee landlord in this debacle.[31]

As to damages, which could be indicative of the extent of interference, Hidden Village

alleges that it lost an opportunity to sell the apartment complex and that the property value of the

complex has declined.  ECF No. 52-1 at 16 and 20.

Accordingly, drawing all reasonable inferences from the facts in Hidden Village's favor, it

can be said that Defendants interfered with Hidden Village in violation of § 3617.  *See People*

*Helpers*, 789 F. Supp. at 733 n.5 (E.D. Va. 1992) (stating "when the full weight of the City is

brought to bear on a person and where criminal and other types of investigations are threatened in

order to discourage Plaintiffs from helping minorities find suitable housing, then it cannot be said

---

[31]  The record reflects that Hidden Village was involved in at least one of the meetings between
the City and YRP.  ECF No. 49-15 at 7-8.  The Complaint also indicates Hidden Village's
attorney was involved in interactions with Lakewood (ECF No. 1 at 17-18), and that letters were
sent to the City to complain about the alleged discriminatory conduct.  ECF No. 1 at 19.

(1:10 cv 0887)

that interference, coercion, or intimidation of the type contemplated by § 3617 did not occur").

Therefore, the Court finds that Defendants are not entitled to summary judgment with respect to

Hidden Village's § 3617 FHA claim.

### C.  42 U.S.C. §§ 1981 and 1982

Hidden Village also argues that Defendants' alleged discriminatory conduct violated the

Civil Rights Act of 1966, codified at 42 U.S.C. § 1982, and the Civil Rights Act of 1970, codified

at 42 U.S.C. § 1981.  42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in
> every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens and shall be subject
> to like punishment, pains, penalties, taxes, licenses, and exactions of every kind,
> and to no other.

42 U.S.C. § 1982 states:

> All citizens of the United States shall have the same right, in every State and
> Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell,
> hold, and convey real and personal property.

### 1.  Whether Hidden Village has Standing to Sustain §§ 1981 and 1982 claims

Before turning to any other issue, the Court must first address Defendants' first challenge

aimed at these claims —whether Hidden Village has standing to maintain the §§ 1981 and 1982

claims.[32]  *See Children's Healthcare Is A Legal Duty v. Deters*, 92 F.3d 1412, 1419 (6th Cir.

1996) (explaining that constitutional standing is always a threshold inquiry that courts must make

---

[32]  The Sixth Circuit has also explained that because 42 USC §§1981 and 1982 share a common
origin and purpose, both statutes are generally considered in tandem.  *See Tillman v.
Wheaton-Haven Recreation Ass'n*, Inc., 410 U.S. 431, 439-40 (1973).

(1:10 cv 0887)

before asserting jurisdiction over the merits of a case).  The determination of whether a particular plaintiff has standing is a two-part inquiry involving constitutional and prudential standing considerations.  *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir. 1991).

Whether Hidden Village has met the constitutional standing threshold is not in dispute. Instead, Defendants argue that they are entitled to summary judgment because Hidden Village fails to meet the prudential standing requirements to assert §§ 1981 and 1982 claims on behalf of third parties.  ECF Nos. 49 at 22-26 and 59 at 14-15.  Defendants remind the Court that, "prudential standing considerations include whether the plaintiff's relationship with the third-party was sufficiently close to be adversely affected by the defendants' alleged actions against the third-party, and whether the third-party is unable to assert a violation."  ECF No. 59 at 14-15. Defendants argue that Hidden Village has failed to meet these prudential standing considerations because: (1) Hidden Village did not have a relationship with YRP enrollees and the relationship with the LMM was limited to lease agreements; (2) there is no evidence that the Lakewood Defendants' actions caused a reduction in the number of YRP enrollees at Hidden Village;[33] (3) there is no evidence that either the YRP enrollees or LMM would be unable to assert a claim under §§1981 and 1982.  ECF No. 59 at 14-15.

The Court, however, finds that Defendants misapprehend Hidden Village's position. Contrary to Defendants' assertion, Hidden Village is asserting its own legal interest rather than those of third parties.  ECF No. 52 at 21 and 22.  Although Hidden Village is an organization that

---

[33] Defendants allege the number of YRP participants increased.  Interestingly, Defendants do not offer the number or percentage of the additional participants.

(1:10 cv 0887)

lacks a racial identity, such a factor is irrelevant to standing.  "This [C]ourt has previously found

that non-minorities have standing to maintain discrimination actions for injuries suffered by

them[selves] as a result of racially discriminatory practices" against a racial minority.  *Old West*

*End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1102 (N.D. Ohio 1987) (citing

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, (1972); *Harrison v. Otto G. Heinzeroth*

*Mortgage Co.*, 414 F.Supp. 66 (N.D. Ohio 1976); *Watts v. Boyd Props., Inc.*, 758 F.2d 1482 (11th

Cir. 1985)).  Thus, Hidden Village is not resting its claims on injuries suffered by their tenant

YRP; it is, rather, seeking relief for specific injuries it suffered.[34]

### 2.  Whether Hidden Village has Established §§ 1981 and 1982 *Prima Facie* Case

The Sixth Circuit has explained that discrimination claims under §§ 1981 and 1982 are

analyzed like discrimination claims under FHA by using a *prima facie* standard employed to

---

[34]  To the extent Defendants argue that the evidence presented in the record fails to indicate that Hidden Village suffered an injury cognizable under §§ 1981 and 1982 because Plaintiff has not shown that the complained of conduct had a tangible or material effect on its contractual relationship, such as causing a reduction with YRP or LMM, the Court finds this argument unpersuasive.  The Court acknowledges that while FHA and §§ 1981 and 1982 are often analyzed together because they share the same analytical framework, the statutes are not the same, and therefore "do not provide identical protections and prohibitions."  *See Campbell*, 162 Fed. Appx. at 476 (6th Cir. 2006).  The scope of §§ 1981 and 1982 covers claims alleging the deprivation of "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship."  *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 873 (6th Cir. 2001) (adopting a prima facie case of § 1981 that permits a party to bring a cause of action when contractual relationship isn't severed and when receiving services in a markedly hostile manner); *see also Campbell*, 162 Fed. Appx. at 476 (6th Cir. 2006) ("sections 1981 and 1982 merely ensure that all persons or citizens have "the same right" to make contracts and lease property as white citizens.)

(1:10 cv 0887)

prove a viable claim under the FHA.  *See Campbell v. Robb*, 162 Fed. Appx. 460, 474-75 (6th Cir.

Accordingly, because the Court has already concluded that Hidden Village has established a

viable FHA claim, the Court finds that Hidden Village has established a *prima facie* case of

§§ 1981 and 1982.

However, the Court *sua sponte* dismisses Hidden Village's § 1981 claim against

Lakewood and the Defendants named in their official capacities.[35]  In *Arendale v. City of*

*Memphis*, the Sixth Circuit held that a claim under 42 U.S.C. §1981 cannot be maintained against

a governmental entity.  *Arendale v. City of Memphis*, 519 F.3d 587, 598-99 (6th Cir. 2008)

("finding no independent cause of action against municipalities is created by § 1981(c).").

**D.  42 U.S.C. § 1983**

Hidden Village's remaining federal law claims are brought pursuant to 42 U.S.C. § 1983.

In pertinent part, § 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws . . . .

42 U.S.C. § 1983.

Section 1983 is not itself a source of substantive rights, but merely provides a method for

vindicating federal rights conferred elsewhere.  *See Graham v. Connor*, 490 U.S. 386, 393-94

---

[35] Suing Defendants in their official capacity is the same as suing the governmental entity.
*Kentucky v. Graham,* 473 U.S. 159, 166 (1985).

(1:10 cv 0887)

(1989).  Thus, to state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

In the instant case, no question exists as to whether Defendants acted under the color of state law.  The dispute, with respect to § 1983, therefore, is centered upon whether the complained of conduct violated Hidden Village's constitutional rights.  According to Hidden Village, Lakewood's inspections implicate Fourth Amendment rights against unreasonable searches.  ECF No. 52 at 25-26.  Hidden Village also contends that Defendants' alleged discriminatory conduct was violative of the Equal Protection Clause of the Fourteenth Amendment.  ECF No. 52 at 25-26.  Defendants move for summary judgment challenging both constitutional claims.

### 1.  Fourth Amendment Violation

#### a.  Whether Hidden Village has Standing to Sustain a Fourth Amendment  § 1983 Claim

Defendants first challenge Hidden Village's Fourth Amendment claim by asserting that Hidden Village lacks standing to bring a claim under 42 U.S.C. § 1983.  ECF Nos. 49 at 23-24 and 59 at 23-24.  In support of this argument,  Defendants chiefly rely upon the Sixth Circuit case, *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544 (6th Cir. 2003), which held that a landlord did not have standing to bring a § 1983 claim for an alleged unreasonable search because the landlord lacked an expectation of privacy in the searched rented apartment.  Defendants urge that the joint inspection, which forms the basis of the instant Fourth Amendment claim, was alleged by the

61

(1:10 cv 0887)

Plaintiff to have occurred in Buildings C and D–buildings that were rented to and occupied by

Hidden Village's tenant—YRP.  ECF No. 52 at 10.  Thus, Defendants reason that as in

*Shamaeizadeh*, Hidden Village lacked an expectation of privacy in the areas searched, and

therefore does not have standing to assert a § 1983 claim.[36]  *See Id.* at 544.  The Court agrees.

A Fourth Amendment § 1983 claim is entirely personal to the direct victim of the alleged

victim.  *See Claybrook v. Birchwell*, 199 F.3d 350, 357.  Thus, in order to sustain the instant

claim, it is not sufficient for Hidden Village to allege or produce evidence that its tenant—YRP–

had a reasonable expectation of privacy in the area searched and Defendants' conduct contravened

that expectation in violation of the Fourth Amendment.  Hidden Village must show that

Defendants' actions in some way interfered with *its* own reasonable expectation of privacy and

therefore violated *its* personal Fourth Amendment right to be free from unreasonable searches.

*See Shamaeizadehm* 338 F.3d at 544 (6th Cir. 2003) (citing *United States v. Knotts*, 460 U.S. 276,

281 (1983)).  Hidden Village has failed to do this in this case.

The Sixth Circuit has instructed the Court to consider five factors when determining

whether someone has a reasonable expectation of privacy:  (1) "the person's proprietary or

possessory interest in the place to be searched or item to be seized;"  (2) "whether the [plaintiff]

has the right to exclude others from the place in question;" (3) "whether he had taken normal

precautions to maintain his privacy;" (4) "whether he has exhibited a subjective expectation that

the area would remain free from governmental intrusion;" and (5) "whether he was legitimately on

---

[36] Again, Gilman acknowledged that Buildings C and D were searched in their entirety, and parts
of Building B and none of Building A were searched.

(1:10 cv 0887)

the premises."  *Id.* at 544-45 (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000);

*see also Hardwig v. United States*, 23 F.2d 922, 922 (6th Cir. 1928) (holding that a lessee who

sublets to a sublessee has "no right to object to evidence of what was found or done there").

Applying these factors to this case, the Court finds that Hidden Village had no reasonable

expectation of privacy within the YRP buildings.  While Hidden Village had an ownership

interest in the building, "ownership alone does not justify a reasonable expectation of privacy."

*Shamaeizadeh*, 338 F.3d at 544; *see also United States v. Salvucci*, 448 U.S. 83, 91 (1980)

("[W]hile property ownership is clearly a factor to be considered in determining whether an

individual's Fourth Amendment rights have been violated, property rights are neither the

beginning nor the end of this Court's inquiry.") (citation omitted).  There must be additional

evidence demonstrating a privacy interest in the areas alleged to have been unreasonably searched.

*See Shamaeizadeh*, 338 F.3d at 544.  Hidden Village fails to present to the Court evidence

establishing that it maintained an expectation of privacy interest in the YRP-occupied buildings.

Accordingly, in absence of this evidence, the Court dismisses Hidden Village's Fourth

Amendment claim for lack of standing.  *Id.*; *see also Bailey v. Floyd County Bd. of Educ.*, 106

F.3d 135, 145 (6th Cir. 1997) ("When a defendant moves for summary judgment on the ground

that the plaintiff lacks evidence of an essential element of the plaintiff's claim, as in the present

case, Rule 56 *requires the plaintiff* to present evidence of evidentiary quality that demonstrates

the existence of a genuine issue of material fact.") (emphasis added).

(1:10 cv 0887)

### 2. Fourteenth Amendment Violation

As to Hidden Village's second constitutional claim—alleging that Defendants general

discriminatory conduct violated the equal protection clause, Defendants argue that they are

entitled to summary judgment concerning this claim for several reasons:  (1) Hidden Village has

failed to plead a Fourteenth Amendment § 1983 claim; (2) Hidden Village lacks standing to

sustain a Fourteenth Amendment § 1983 claim; (3) Hidden Village has failed to establish a

Fourteenth Amendment § 1983 *prima facie* case; (4) Hidden Village § 1983 claim against

Lakewood and the named Defendants in their official capacities fails as a matter of law.  The

Court addresses Defendants' first two arguments with brevity as neither argument requires

significant discussion.

### a. Whether Hidden Village has Failed to Plead a Fourteenth Amendment  § 1983 claim

Defendants first contend that the §1983 Fourteenth Amendment Equal Protection Claim

should be disregarded or dismissed for failure to plead.  They point to the Complaint, which they

argue fails to reference either the Fourteenth Amendment or Equal Protection Clause and fails to

provide any factual allegations of a discriminatory effect or that Defendants actions were

motivated by discriminatory purpose.  Thus, Defendants contend that they lacked fair notice of the

Fourteenth Amendment claim, which necessitates the claim's dismissal  ECF No. 59 at 10-12.

The Court, however, disagrees.

Complainants are not required to set out intricately detailed factual allegations, nor are

they always required to set out their legal theories. *See Ashcroft v. Iqbal., 129 S.Ct. 1937, 1949*

64

(1:10 cv 0887)

(2009).  A claim's allegations must "possess enough heft" to show an entitlement to relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  The Court finds that the Complaint, albeit minimally, meets this threshold and therefore provides sufficient notice of Hidden Village's Fourteenth Amendment § 1983 claim.

### b.  Whether Hidden Village has Standing to Assert a Fourteenth Amendment § 1983 claim

Defendants' second argument attacks Hidden Village's standing to assert an equal protection claim.  They remind the Court that prudential limitations do not permit one to vindicate the civil rights of third parties.  Thus, Defendants argue that the instant claim attempts to seek relief on behalf of the YRP or LMM and, as such, should be dismissed.

But, unlike Hidden Village's Fourth Amendment claim, which sought relief for conduct that appeared to violate its tenants' constitutional rights, the instant claim, seeks relief for general discriminatory treatment (*e.g.,* beyond Lakewood inspections) that also implicates Hidden Village's " individual[] right to contract or associate with members of a protected class."  *See Young Apts., Inc. v. Town of Jupiter,* 529 F.3d 1027, 1039 (11th Cir. 2008).  Accordingly, the Court finds that Defendants' argument lacks merit.  Hidden Village has standing to assert its own claims arising out of its own injury in fact, rather than on behalf of its tenant.[37]

_____

[37]  *See Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 17 (1st Cir. 1979), vacated on other grounds, 454 U.S. 807 (1981) (finding that real estate corporation has standing under § 1983 to allege that state municipality *its* 14th Amendment rights by discriminating against the corporation for its willingness to sell housing to low-income and minority families); *Pagliuco v. City of Bridgeport, 2005 U.S. Dist. Lexis 33738, at *16-17 (*D.Conn. 2005) (finding that club owners have standing to bring equal protection claims under § 1983 alleging they were singled out for enforcement because of their African American clientele; explaining that prudential bar

(1:10 cv 0887)

### c. Whether Hidden Village has Failed to Establish a Fourteenth Amendment §1983 *Prima Facie* Case

Lastly, Defendants contend that they are entitled to summary judgment with respect to the §1983 claim because Hidden Village has failed to establish this claim.  They argue that Hidden Village has failed to produce any evidence of a discriminatory effect.  As proof that Hidden Village has failed in this respect, Defendants point to the lack of evidence concerning entities that were similarly situated to Hidden Village and who were treated more favorably.

However, the Sixth Circuit has stated that " while a discriminatory inference is usually, and perhaps most readily, generated through evidence of unfavorable treatment of the minority plaintiff *vis-a-vis* similarly-situated individuals, *McDonnell Douglas* and its progeny do not require this always be the case . . ." *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009). Accordingly, the Court holds that Plaintiff's failure to allege similarly situated parties does not doom its §1983 claim.

Furthermore, a plaintiff need only  present direct evidence of discrimination, or establish a *prima facie* case of discrimination under the burden-shifting scheme set forth in  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish a race based equal protection claim.

---

against third-party standing is not relevant because "[p]laintiffs are not attempting to vindicate the rights of their clientele.  They are asserting their own right to be free from unequal enforcement of the laws based on discriminatory criteria-namely the race of their patrons."); *Hallmark Developers, Inc. v. Fulton County*, 2004 WL 5492706, 2004 U.S. Dist. LEXIS 30616, at *51 (N.D. Ga. Sept. 27, 2004) (finding that plaintiff housing developers "have Article III standing to vindicate, at a minimum, their own rights" under § 1983 based on allegations that discriminatory zoning decisions prevented development of housing for low-income and minority residents).

(1:10 cv 0887)

*See* *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (finding that discrimination under § 1983 is proved through the *McDonnell Douglas* framework).

Because the Court finds that analyzing Hidden Village's claims pursuant to the *McDonnell Douglas* framework demonstrates that there is a genuine issue of material fact with respect to whether Defendants' legitimate reasons are pretextual, the Court rules that Hidden Village has a viable equal protection claim.  Accordingly, Defendants are not entitled to summary judgment concerning the Fourteenth Amendment § 1983 claim.

### d. Whether Hidden Village's § 1983 Monell Claim Fails as a Matter of Law

To establish municipal liability pursuant to § 1983, a plaintiff must allege an unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or a "constitutional deprivation[] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  Only then can "the action of the municipality itself . . . be said to have caused the harm." *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994); *City of Canton v. Harris*, 489 U.S. 378, 385,(1989) ("[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983").

Municipalities and other bodies of local government are "persons" within the meaning of §1983 and may therefore be sued directly if they are alleged to have caused a constitutional tort

67

(1:10 cv 0887)

through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 (1978).

Defendants contend that the *Monell* claim fails as a matter of law. They rely upon two distinct arguments in support of this position. First, they contend that the claim must fail because it lacks an underlying constitutional violation. Second, they aver that the evidence fails to establish an official policy, which must directly cause the claimed violation.

The Court finds Defendants' position untenable for the following reasons. First, as the Court has already indicated, Hidden Village has presented a viable Fourteenth Amendment claim which supports imposing *Monell* liability. Additionally, the Court finds that the record contains more than sufficient evidence from which a reasonable jury could infer the existence of discriminatory policy.

The Supreme Court has indicated that an unconstitutional governmental policy can be inferred from a single decision by the highest officials responsible for setting policy in a particular area of the government's business. *Owen v. City of Independence*, 445 U.S. 622 (1980); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). On the other hand, official policy cannot be inferred from the single unauthorized act of a subordinate government agent, *e.g.*, an unauthorized shooting by a police officer. *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) ("By itself, 'the wrongful conduct of a single officer without any policy-making authority did not establish municipal policy.'" quoting *Collins*

68

(1:10 cv 0887)

*v. City of Harker Heights*, 503 U.S. 115, 121 (1992).

Identification of the official whose decisions represent the official policy of a particular local governmental unit is a question of law to be decided by the judge.  *See McMillian v. Monroe County, Ala.*, 520 U.S. 781, 784-85 (1997), citing *Jett v. Dallas Ind. School Dist.*, 491 U.S. 701, 737 (1989).  In this case, there is sufficient evidence to infer the existence of a policy made by then Mayor George and a decision to apply that policy to Hidden Village made on authority delegated by George, in his former role.  First, the email sent by the former Mayor George in October 2006, is particularly damaging to Defendant's averment that there lacked an official policy regarding Lakewood.  In reprimanding a City employee, the Mayor instructed the employee to work with his aid, Favre regarding Hidden Village in the future.  He also stated: "Any policy from this Administration regarding [Hidden Village] will be directed through Favre."  ECF No. 52-1.  This email minimally suggests that not only was there a policy concerning Hidden Village, but that their Mayor was responsible for formulating the policy and delegated to Favre.  Additionally, the February 28, 2007  letter sent by the Mayor to the President of LMM supports the Court's conclusion.  ECF No. 52-24.  The Mayor stated that he would  "seek to have the program removed from Lakewood at the earliest possible time" and further testified.  ECF No. 52-24 at 2.

When combined with additional circumstantial evidence – such as evidence pointing to pretext and *prima facie* case including testimony that the then Mayor's right hand man (Sergeant Favre) stated that he was concerned about there being "a lot of blacks" in the program"—one could easily infer that the policy had a discriminatory motive.  ECF No. 52-6 at 4.  Viewing the

(1:10 cv 0887)

facts most favorable to Hidden Village, they, albeit minimally, support an inference that it was the official policy of the City of Lakewood to harass and intimidate Hidden Village and the YRP participants as a means to remove or cause the removal of YRP from the community. Accordingly, the Court finds that summary judgment is not appropriate.

**E.  Qualified Immunity**

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, (2009).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).  To defeat a claim of qualified immunity, a plaintiff must show:  (1) the facts viewed in the light most favorable to the plaintiff show that a violation of the plaintiff's constitutional rights occurred and, (2) the constitutional right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001), overruled in part on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009).  Thus, government actors are shielded from liability if they establish either that (1) the plaintiff's allegations fail to make out a violation of a

(1:10 cv 0887)

constitutional right, or (2) the right at issue was not clearly established at the time of the alleged misconduct.  *See Pearson*, 129 S.Ct. at 815-16.  Courts have discretion, based upon the circumstances of the case, to decide which of the two inquiries should be addressed first.  *Pearson*, 129 S.Ct. at 818.

Having already determined that Hidden Village has presented viable claims under the FHA, §§ 1982 and 1983, the Court completes the second inquiry–determining whether such rights were clearly established.

For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992).  In other words, the unlawfulness must be apparent under preexisting law.  The unlawfulness of an action may be apparent in light of  "direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)  As importantly, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see Russo*, 953 F.2d at 1042 ("It need not be the case that the very action in question has previously been held unlawful.").

Defendants argue that none of the individual Defendants should have known that their conduct violated any of the aforementioned federal laws.  The evidence present in the record belies this contention.

71

(1:10 cv 0887)

*Mayor George*: Defendants posit that then Mayor George's actions were motivated by legitimate nondiscriminatory reasons relating to the strict enforcement of Lakewood zoning code; a concern for an increase in criminal activity near Hidden Village; and LMM staff's non-cooperative stance with police inquiries regarding potential criminal activity. ECF No. 59 at 25.

Given that the Court has already determined that these proffered reasons can be construed as pretextual, the Court finds that there remains a genuine issue of material fact with respect to whether the former George is eligible for qualified immunity. Accordingly, qualified immunity is denied.

*Barrett*: Regarding Barrett, Defendants contend that he is precluded from liability because he was only involved in the initial zoning determination concerning YRP's occupancy of Hidden Village Apartments. Moreover, Defendants contend his actions concerning the initial zoning determination were reasonable and legitimate. ECF No. 49 at 27-28.

As previously indicated, the Court disagrees. First, there is evidence present in the record showing Barrett maintained his involvement in the City's interactions with Hidden Village, after the Lakewood Planning Commission had rendered its decision, overturning Barrett's finding. Moreover, while Defendants aver that Barrett's interpretation of the zoning code was reasonable, a reasonable jurist could disagree, in light of the other evidence present in the record, and could easily find that Barrett's "reasonable interpretation" of the concerning zoning determination was fueled by a discriminatory motive. Accordingly, qualified immunity for Barrett is denied.

(1:10 cv 0887)

*Fitzgerald*:  Additionally, Defendants aver that Fitzgerald's limited role in the zoning

issues and joint inspection precludes him from liability.  The Court disagrees.  Not only is there

evidence indicating that Fitzgerald and other Lakewood officials held meetings, wherein the

officials brain stormed on how to expel YRP from Lakewood,[38] the record also reflects that

Fitzgerald directed at least one Lakewood City employee to participate in the joint inspection for

discriminatory reasons.  ECF No. 43-1 at 43-44.  Accordingly, the Court finds that Fitzgerald is

also not entitled to qualified immunity.

### F.  Trespass

Invoking the Court's supplemental jurisdiction, Hidden Village's remaining claim alleges

trespass under Ohio law.

"The essential elements necessary to state a cause of action in trespass are: (1) an

unauthorized intentional act, and (2) entry upon land in the possession of another."  *Brown v.*

*County Comm'Rs*, 87 Ohio App. 3d 704, 716 (Ohio Ct. App., 1993).

Defendants allege that Hidden Village cannot succeed on its trespass claim.  They argue

that the City of Lakewood cannot be liable for trespass as the joint inspection team had authority

to and were privileged to enter upon the land *via* the Lakewood Ordinances and the Ohio Revised

Code.  *See* Kramer v. Angel's Path, LLC, 174 Ohio App.3d 359, 369 (Ohio Ct. App., Erie County

2007) ("A common-law tort in trespass upon real property occurs when a person, without

authority or privilege, physically invades or unlawfully enters the private premises of another

---

[38] ECF Nos. 52-27; 52-28

73

(1:10 cv 0887)

whereby damages directly ensue[.]") (citations and internal quotes omitted).  They contend that the joint inspection team was granted access by LMM/YRP.

Former Mayor George, Barrett, and Fitzgerald, in their individual capacities, aver that they are not liable for trespass because Hidden Village is unable to show that these Defendants personally entered into Hidden Village's property.  ECF No. 49 at 35.

Hidden Village responds by stating that even if the individual Defendants did not personally enter upon its property, liability would, nevertheless, attach because evidence suggests that each named Defendant caused those who performed the "raid" to do so.  *See Baker v. Shimkivh,* 6 Ohio St.3d 151, 153 (1983) (stating that"[o]ne is subject to liability to another for trespass . . . if he intentionally [ ] enters land in the possession of the other or causes a thing or a third person to do so") (internal quotations and citations omitted).  In support of this argument, Hidden Village points to the testimony of Fitzgerald indicating that Fitzgerald provided an inspector to participate in the joint inspection.  ECF No. 43-1 at 43-44.  Plaintiff also states that "Barrett admitted that he, too, was responsible for enforcing the building codes."  ECF No. 52-31.  With respect to the former Mayor George's involvement in the inspections, Hidden Village argues that the timing of the "raid" which occurred only six days after a heated meeting involving then Mayor George, during which YRP was asked to leave Lakewood, also suggests that he was responsible for the raid.  ECF Nos. 52-4 at 25-27.

In replying to Defendants' contention that the City of Lakewood cannot be held liable as they had privilege to enter upon the property, Hidden Village argues that there remains a genuine issue of material fact concerning this issue, especially when the testimony of Lieberman and

74

(1:10 cv 0887)

Withers, which indicates that they objected to Lakewood Officials' presence within Hidden Village Apartments, is considered.[39]

The Court agrees.  Given that the evidence present in the record fails to explicitly indicate whom was responsible for the raid, and that Hidden Village has provided ample evidence to suggest that Defendants acted in concert to discriminate against Hidden Village, the Court finds that there is a genuine issue of material fact with respect to whether Defendants directed Lakewood employees to enter upon Hidden Village's property and whether Defendants were privileged to enter.  The analysis does not, however, end here.

### G.  State Law Immunity

Defendants contend that if the Court were to find that there remains a genuine issue of material fact with regard to the trespass claim, all the Defendants are immune pursuant to R. C. Chapter 2744.  They argue that Lakewood is a political subdivision under R.C. § 2744.01(F) and is therefore entitled to immunity under R.C. § 2744.02, along with the individual Defendants in their official capacities.  ECF Nos. 49 at 30-32 and 59 at 27-28.  They also contend that the Defendants named in their individual capacities are entitled to immunity as well pursuant to § 2744.03(A)(6).  ECF Nos. 59 at 27-28 and 49 at 32-33.

---

[39] Lieberman testified that he told Watts, a manager of Hidden Village, to inform Lakewood Officials that they lacked permission to enter upon the property without a warrant.  ECF Nos. 52-1 at 13 and 49-18 at 4-6.  Also, Withers testified that she objected to the inspection; the joint inspection team ignored her request that they wait to begin the inspection until she had sought approval from a superior.  ECF No. 52-4 at 17-18.

(1:10 cv 0887)

### 1. Lakewood and Individual Defendants Named in their Official Capacities

Courts are required to conduct a three-tiered analysis to determine whether a political

subdivision should be immune from tort liability under R.C. §2744.02.  *See Henney v. Shelby City*

*School District*, 2006 Ohio 1382, 2006 WL 747475 (Ohio App. 5th Dist. 2006).  First, the general

rule pursuant to § 2744.01(A)(1) is that political subdivisions are not liable for damages when

performing either a governmental or proprietary function.  Second, once immunity is established,

courts must determine whether one of the exceptions to immunity set forth in § 2744.01(B)(1) -

(5) apply.  Third, if one of the § 2744.01(B) exceptions applies, immunity can be reinstated if the

political subdivision can show that one of the defenses set forth in § 2744.03 applies.

Here, the Defendants correctly observe that under the first tier of the Court's

analysis—§ 2744.01(A)(1) provides immunity to political subdivision the City of Lakewood.

Defendants urge the Court that, pursuant to the second tier of the immunity analysis, Lakewood's

immunity is maintained because none of the exceptions set forth in § 2744.01 applies.  ECF Nos.

49 at 32 and 59 at 27.

Seemingly conceding that none of the exceptions set forth in § 2744.01(B)(1) - (5) apply to

the instant case, Hidden Village argues that, because Lakewood was not engaged in a

governmental function as required by the first inquiry, the entire immunity statute is inapplicable

to the instant case and therefore, the Court should forego an immunity analysis.  Hidden Village's

support for advocating that the Court disregard the statutory analysis is as follows: rather than

employing the powers of the numerous departments that raided Hidden Village [Apartments] on

May 22, 2007 for its legitimate powers of inspection and police service, the evidence reveals that

(1:10 cv 0887)

the City employed those departments to harass, intimidate, and pressure the YRP to leave Hidden Village and the City of Lakewood." ECF No. 52 at 33.  Consequently, Hidden Village avers that there is an issue of fact regarding whether the City was engaged in a governmental function under the first tier of the analysis or, stated more plainly, whether the statutory immunity applies at all. Lakewood, Hidden Village concludes, is, therefore, not entitled to summary judgment on this issue. ECF No. 52 at 33.

While Hidden Village is to be applauded for creative legal reasoning, the Court finds the argument lacks of merit.  Hidden Village fails to cite to case law or other legal authority in support of this novel claim, and existing case law clearly contradicts Hidden Village's argument. Pursuant to Ohio State law, there are no statutory exceptions to political subdivision immunity for intentional torts, *see Culberson v. Doan*, 125 F. Supp. 2d 252, 282 (S.D. Ohio 2000), finding that political subdivisions retain their cloak of immunity stemming from intentional torts.  The Court finds that the City of Lakewood is entitled to immunity for the trespass claim.  *Id*.

## 2.  Defendants Named in their Individual Capacity

The Court concludes that Defendants named in their individual capacities are not entitled to statutory immunity for the trespass claim.

The pertinent part of Chapter 2744 provides that an employee of a political subdivision is immune from liability unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]

77

(1:10 cv 0887)

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. . . .

Ohio Rev. Code Ann. § 2744.03(A)(6); *see also* *Sabo v. City of Mentor*, 2011 U.S. App. Lexis 18822, *8-9 (6th Cir. 2011).

Both Defendants and Hidden Village seemingly agree that the relevant provision in this case is subparagraph (b),[40] which, in order for one to be exempt from statutory immunity, necessitates a showing that the acts or omissions of the individual Defendants were "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.*

One Ohio court recently explained how Ohio courts have interpreted this exception to statutory immunity:

> One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm. Malice includes the willful and intentional design to do injury, or the intention or desire to harm another through conduct which is unlawful or unjustified. Bad faith is defined as a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive or ill will. A person acts wantonly if that person acts with a complete failure to exercise any care whatsoever. One acts recklessly if one is aware that one's conduct creates an unreasonable risk of physical harm to another[.] Recklessness is more than mere negligence in that the person must be conscious that his [or her] conduct will in all probability result in injury.

*Pritchard v. Hamilton Twp. Bd. of Trs.*, 424 Fed. Appx. 492, 509 (6th Cir. 2011) (citing *Spears v. Akron Police Dept.*, No. 24847, 2010 Ohio 632, 2010 WL 625822, *4 (Ohio. Ct. App. 2010).

For the reasons already detailed in this opinion, the Court finds that there is a genuine issue of material fact as to whether the individual Defendants behaved maliciously, in bad faith

---

[40] ECF Nos. 59 at 27-28 and 52 at 33-35.

78

(1:10 cv 0887)

and with a purpose to cause harm.  Specifically, as Hidden Village has highlighted, the record is replete with facts that could lead a jury to conclude that the Defendants named in their individual capacities acted with discriminatory animus, amounting to bad faith or malice.  Accordingly, the Defendants named in their individual capacities are not entitled to statutory immunity as to the trespass claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment with respect to the 42 U.S.C. § 1981 claim; the Fourth Amendment 42 U.S.C. § 1983 claim; and the trespass State law claim against Defendant Lakewood and the Defendants named in their official capacities. The Court DENIES Defendants' Motion for Summary Judgment for all remaining claims.

A final pre-trial conference will take place on **August 6, 2012** at **1:30 p.m.** in Chambers 313, Federal Building - United States Courthouse, 125 Market Street, Youngstown, Ohio.  The trial of this matter shall begin on **August 27, 2012**  at **9:00 a.m.** on a two-week stand-by basis in Courtroom 351, Federal Building - United States Courthouse, 125 Market Street, Youngstown, Ohio.

IT IS SO ORDERED.

3/30/2012

Date

Benita Y. Pearson
United States District Judge
79